

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-18-00118-CV

Jesus **VIRLAR**, M.D. and GMG Health Systems Associates, P.A., a/k/a and d/b/a Gonzaba
Medical Group,
Appellants

v.

Jo Ann **PUENTE**,
Appellee

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2014-CI-04936
Honorable Norma Gonzales, Judge Presiding

### OPINION ON MOTION FOR REHEARING

Opinion by:     Liza A. Rodriguez, Justice
Concurring and Dissenting Opinion by: Sandee Bryan Marion, Chief Justice
Concurring and Dissenting Opinion by: Patricia O. Alvarez, Justice

Sitting:[1]     Sandee Bryan Marion, Chief Justice
            Patricia O. Alvarez, Justice
            Luz Elena D. Chapa, Justice
            Irene Rios, Justice
            Beth Watkins, Justice
            Liza A. Rodriguez, Justice

Delivered and Filed: October 14, 2020

AFFIRMED IN PART AS MODIFIED, REVERSED AND REMANDED IN PART; MOTION
FOR REHEARING GRANTED

---

[1] Justice Rebeca C. Martinez has recused herself from this appeal.

This appeal arises from a medical malpractice action filed by Jo Ann Puente against Dr. Jesus Virlar and GMG Health Systems Associates, P.A., a/k/a and d/b/a Gonzaba Medical Group ("Gonzaba"). A jury found Dr. Virlar liable for Puente's injuries, and judgment was rendered in favor of Puente and against Dr. Virlar and his employer, Gonzaba. On appeal, Dr. Virlar and Gonzaba bring five issues:

(1) whether the trial court erred in excluding the expert testimony of Dr. Ralph W. Kuncl;

(2) whether the trial court erred in admitting evidence of Dr. Virlar's loss of privileges and alleged extraneous bad acts in treating other patients in violation of Texas Rule of Evidence 403;

(3) whether the evidence is legally and factually sufficient to support the jury's award of $888,429.00 in future loss of earning capacity;

(4) whether the trial court erred in refusing to apply a settlement credit in the amount of the hospital's settlement with Puente's minor daughter; and

(5) whether the trial court erred in failing to order that future damages should be paid in whole or in part in periodic payments rather than by lump sum pursuant to section 74.503 of the Texas Civil Practice and Remedies Code.

In our opinion of February 5, 2020, we found no error on the part of the trial court with respect to the first and second issues. *See Virlar v. Puente*, No. 04-18-00118-CV, 2020 WL 557735, at *8, *12, *15, *17 (Tex. App.—San Antonio Feb. 5, 2020, no pet. h.) ("*Virlar I*"). With respect to the third issue, we held that the evidence was legally and factually sufficient to support loss of future earning capacity in the amount of $880,429.00, but not in the full amount awarded ($888,429.00), and therefore suggested a remittitur decreasing the award for loss of future earning capacity by $8,000.00. *See id*. at *20, *33 (citing TEX. R. APP. P. 46.3). Regarding the fourth issue, we remanded the cause for the trial court to conduct a benefits analysis pursuant to *Utts v. Short*, 81 S.W.3d 822 (Tex. 2002). *See Virlar I*, 2020 WL 557735, at *29. Finally, with regard to the fifth

issue, we found no abuse of discretion by the trial court in failing to award periodic payments for future loss of earning capacity under section 74.503(b) of the Texas Civil Practice and Remedies Code; however, we did find the trial court abused its discretion under section 74.503(a) because it did not order any part of the amount awarded for future medical care expenses to be paid in periodic payments. *See Virlar I*, 2020 WL 557735, at \*32.

Puente then filed two remittiturs with the clerk of this court. *See Virlar v. Puente*, No. 04-18-00118-CV, 2020 WL 2139313, at \*1 (Tex. App.—San Antonio May 6, 2020, no pet. h.) ("*Virlar II*"). The first was a remittitur in the amount of $8,000.00 as suggested in our original opinion in *Virlar I*. The second was a voluntary remittitur in the amount of $434,000.00 pursuant to Texas Rule of Appellate Procedure 46.5, which Puente argued would cure any reversible error committed by the trial court with respect to Issue 4 (the settlement credit issue). Puente also filed a motion for rehearing, requesting that this court reconsider its holdings with respect to Issue 4 (the settlement credit issue) and Issue 5 (the periodic payments of future medical expenses issue). We accepted Puente's first remittitur of $8,000.00. *See Virlar II*, 2020 WL 2139313, at \*1. However, we rejected Puente's second remittitur of $434,000.00 and denied her motion for rehearing. *See id*.

Two days after we issued our opinion on remittitur, the supreme court issued its opinion in *Regent Care of San Antonio, L.P. v. Detrick*, No. 19-0117, 2020 WL 2311943, at \*4-\*6 (Tex. May 8, 2020), which discussed the issue of periodic payments of future medical expenses. On May 20, 2020, Puente filed a second motion for rehearing based on the *Regent Care* decision. We reviewed the motion and requested a response from Dr. Virlar and Gonzaba. After considering the motion and responses filed, we grant Puente's second motion for rehearing. We withdraw our opinions and judgments of February 5, 2020 and May 6, 2020. *See Virlar I*, 2020 WL 557735, at \*33; *Virlar*

*II*, 2020 WL 2139313, at *1 (opinion on remittitur). We substitute this opinion and judgment in their place.

### BACKGROUND

On November 28, 2011, Appellee Jo Ann Puente underwent "Roux-en-Y" gastric bypass surgery, which was performed by Dr. Nilesh Patel. On December 24, 2011, she began having complications from her surgery, including nausea and vomiting. She reported to Dr. Patel that when she attempted to eat solids, she vomited but was able to keep liquids down. On January 11, 2012, Dr. Patel performed an outpatient dilation procedure for a suspected stricture related to the bypass surgery. On January 13, 2012, Puente went to Dr. Patel's clinic in Del Rio, Texas, and was treated for dehydration. The next day, January 14, 2012, Puente went to the emergency room at Metropolitan Methodist Hospital in San Antonio, Texas, where her main complaint was vomiting. She reported she had just had a dilation outpatient procedure and was not better. In the six weeks since her bariatric surgery, Puente had lost 100 pounds. While she was at the emergency room, the results of a CAT scan raised concerns she was suffering from an esophageal rupture. She was admitted to the intensive care unit on the orders of Dr. Manuel Martinez, a hospitalist and employee of Gonzaba, and placed under his care. Dr. Martinez diagnosed Puente with pancreatitis and dehydration. Puente's medical records reflect that she was awake, alert, and able to follow commands. She did not have any "deficit of movement" to her upper or lower extremities.

Because of the possible esophageal rupture, Dr. Martinez ordered Puente to take nothing by mouth and ordered all the medications Puente had been taking since her surgery, including vitamins, to be stopped during her hospitalization. A nutritional assessment was performed by the

hospital's nutritional dietician, who noted that Puente was at nutritional risk; the dietician recommended that "alternate support with TPN needs to be considered."[2]

On January 16, 2012, Appellant Dr. Jesus Virlar, also a hospitalist and Gonzaba employee, assumed Puente's care and treated her until she was discharged on January 26, 2012. On January 16th, medical records indicate Puente was having trouble walking, even with help of the nurses. The nurses noted that Puente complained of dizziness, "tingles" in her fingers, and tight muscles in her shoulder. She was still vomiting. The nurses further noted that Puente had lost control of her bowels; after being helped to the bathroom, Puente did not respond to questions, and her gaze became "fixed." The nurses also noted that Puente needed "additional fall risk elements," including a "tether device," because of an "unsteady gait."

Dr. Virlar noted in Puente's medical records that Puente had "refused" to ambulate and wrote "MAT evaluate for depression?" According to Dr. Virlar, he wrote "MAT," or Mental Assessment TEAM, because he was considering getting a consultation for Puente's mental state. Dr. Virlar testified he thought she might have "a psychological issue" and that she "need[ed] to try harder to walk." Dr. Virlar testified, "Based at the time, under those circumstances, to me, she was depressed and possibly something else [was] going on. I just couldn't put it together." When asked why he did not find significant the nurses' notes that Puente had fixed gaze and was not responding to questions, Dr. Virlar responded, "It was not reported to me." Dr. Virlar admitted that he did not read the nurses' notes. He was asked at trial whether it was true that he never read any of the nurses' notes during the time of Puente's hospitalizations. Dr. Virlar replied, "Not every single one. Maybe I read one or two. I don't recall a specific number, but the majority of the nurses' notes, no, I did not read, sir." Later during his testimony, Dr. Virlar clarified that he "did not look

---

[2] TPN, or total parenteral nutrition, is a method of giving nutrients intravenously to a person. TPN may or may not include thiamine based on the physician's orders.

at the nurses' notes." He was then asked if he wished now that he had reviewed them; Dr. Virlar replied, "No, because that's–it's their subjective interpretation. Somebody's weakness of level of 4, to me may be a level of 3, part of that assessment."

On January 20, 2012, a second nutritional assessment was performed. Since her admission, Puente had been without food and had had nothing by the mouth; the only fluid Puente had received intravenously was saline. Puente was also still vomiting, a condition which started before she was hospitalized. The dietician again recommended TPN. That same day, Puente was put on a trial of clear fluids, but was not able to tolerate the fluids by mouth. Dr. Virlar returned her status to nothing by mouth.

On January 21, 2012, Puente's surgeon, Dr. Patel, wrote in her medical records to "start TPN"; however, Puente was not started on TPN that day. Dr. Patel testified he relied on the hospitalist, Dr. Virlar, to write the appropriate orders. That same day, the physical therapist's progress note stated that Puente was feeling nauseated and vomited "clear spital" in the trash. The physical therapist wrote in the medical records that Puente was demonstrating "Trendelenburg gait," which is a gait seen with people who have weakness in the pelvic muscles. On January 23, 2012, nurses' notes reflected that Puente was still complaining of dizziness and that she was exhibiting right eye nystagmus. On January 24, 2012, Puente said she was having nausea when she opened her eyes.

On January 26, 2012, Puente was discharged with orders for administration of TPN through home health care. Dr. Virlar's discharge diagnosis was (1) "intractable nausea and vomiting"; (2) "obesity"; and (3) "obstructive sleep apnea." Puente never received intravenous vitamins, including any supplemental thiamine, while she was admitted in the hospital. Further, the TPN order written by Dr. Virlar was a custom TPN order, which did not provide for the supplementation

of thiamine.[3] The TPN ordered by Dr. Virlar contained nutrients, including glucose. At trial, Dr. Virlar admitted that if a patient is given glucose before thiamine, the patient's thiamine levels will diminish more rapidly because the thiamine will be "used for the metabolism." According to Dr. Virlar, he learned this fact after he was served with this lawsuit. He admitted that at time of Puente's hospitalizations, he did not know giving glucose to a patient without knowing the patient's thiamine level could be devastating to the patient. Dr. Virlar also admitted at trial that he did not know Wernicke's syndrome[4] was a risk in a post-bariatric patient suffering from "intractable vomiting."

On January 27, 2012, the day after she was discharged, Puente had blood drawn based on orders from Dr. Patel's office; the results showed she had an "abnormal, very abnormally low" level of vitamin B-1 thiamine.[5] Dr. Patel, Puente's surgeon, testified the results were not sent to his office, and he did not see them. On January 31, 2012, Puente went to the emergency room at Val Verde Regional Hospital but was not admitted. On February 2, 2012, she returned to Val Verde Regional Hospital and was admitted. On February 3, 2012, she was transferred to Metropolitan Methodist Hospital in San Antonio and admitted on Dr. Virlar's orders.

Puente's medical records reflect that upon being admitted the second time to Metropolitan Methodist Hospital, she was not responding to stimuli. She became progressively more confused

---

[3] The "premix" TPN, which was not ordered by Dr. Virlar, did contain thiamine. At trial, Dr. Altman testified that giving supplemental thiamine is "very safe" and "very cheap." It should be given to any patient who might be at risk for thiamine deficiency because "the consequences can be devastating and permanent." Puente's treating neurologist, Dr. David Wenzell, also confirmed that there is no downside to giving thiamine because a patient who receives more than they need excretes the surplus in her urine. When asked why he did not give Puente thiamine, especially considering there was "no downside," Dr. Virlar responded that there "was no indication at the time based on my clinical judgment."

[4] Wernicke's syndrome, or Wernicke's encephalopathy, is brain dysfunction associated with thiamine deficiency and is "usually associated with chronic alcoholism or other causes of severe malnutrition." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 761, 2495 (Donald Venes ed., 21st ed. 2009).

[5] According to Dr. Altman, "the reference range–every lab has its own reference range, or normal range," and "in this case, the normal range for their thiamine level would be anywhere from 87 on the low end to 280 on the high end, nanomoles per liter–that's a concentration. And, in this case, Jo Ann [Puente]'s results were 30 nanomoles. So, in other words, less–well less than half of the low end of that reference range."

and her mental status declined. She ultimately needed respiratory support and was put on a ventilator to help her breathe. She experienced weakness in all four extremities and continued to have eye movement abnormalities. On February 11, 2012, a neurosurgeon's diagnostic impression was "encephalopathy[6] of unknown etiology . . . with normal MRI and CT scan of the brain . . . and in the face of [Puente's] history of a prior bariatric surgery, the suspicion is malnutrition related encephalopathy, such as Wernicke encephalopathy[7] as a consideration." On February 13, 2012, Puente's medical records show that thiamine was finally added to her TPN orders.

Puente was discharged on March 9, 2012 and began receiving care at long-term care facilities. She suffered permanent brain damage. Dr. David Wenzell, her treating neurologist, testified Puente was later diagnosed as suffering from Wernicke's syndrome, which progressed to Korsakoff's syndrome. According to Dr. Wenzell, "Wernicke's syndrome is the acute presentation of the illness, and if it persists, it's called Korsakoff's syndrome." "When patients initially experience acute thiamine deficiency, they have Wernicke's syndrome. And if the problem is not dealt with, if it's not treated appropriately, then it progresses into Korsakoff's syndrome." Wernicke's syndrome can be reversed if the patient receives timely thiamine supplements intravenously.

---

[6] One of the experts at trial described encephalopathy as inflammation or irritation of the brain. Encephalopathy is defined as "[g]eneralized brain dysfunction marked by varying degrees of impairment of speech, cognition, orientation, and arousal." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 761 (Donald Venes ed., 21st ed. 2009). "In mild instances, brain dysfunction may be evident only during specialized neuropsychiatric testing; in severe instances (e.g., the last stages of hepatic encephalopathy), the patient may be unresponsive even to unpleasant stimuli." *Id.*

[7] Wernicke encephalopathy is caused by thiamine deficiency. At trial, Dr. David Joseph Altman, a board certified neurologist, testified symptoms of Wernicke's encephalopathy include "ataxia, or problems with coordination; confusion, which is also called encephalopathy; and eye movement abnormalities, things like nystagmus where the eyes move rapidly or problems where the eyes are not moving together." Dr. Altman testified thiamine deficiency caused Puente to develop "changes in her mental state, causing confusion [and] behavioral changes." "It caused problems with her coordination . . . as well as strength issues in her upper and lower extremities. And it also affected her eye movements, such that they were not moving together. She was experiencing jittery movements, called nystagmus of her eyes. All of those are classic for Wernicke's encephalopathy."

On March 26, 2014, Puente[8] and her mother[9] sued Dr. Virlar, Gonzaba, and numerous other healthcare providers involved in Puente's care.[10] With regard to Dr. Virlar and his employer, Gonzaba, Puente and Carr sued them for negligence in diagnosing, monitoring, and treating nutritional deficiencies of Puente during her hospitalization at Metropolitan Methodist Hospital in January 2012. Puente sought damages for physical pain and mental anguish; she also alleged that she incurred loss of earnings in the past, loss of earning capacity in the future, and medical expenses in the past and future. Puente's minor daughter alleged that as a result of her mother's injuries, she had suffered damages in the past, and will incur damages in the future, for "loss of parental consortium, emotional trauma, and loss of care, maintenance, labor services, kindness, affection, protection, emotional support, attention, services, companionship, care, advice, and counsel." Puente's mother, Carr, alleged that she had suffered loss of services as a result of her daughter's injuries.

Before trial, Carr, individually and as guardian of Puente's minor child, settled with or non-suited all defendants, including nonsuiting the claims against Dr. Virlar, Dr. Martinez, and Gonzaba. Puente settled with or non-suited her claims with all defendants except Dr. Virlar, Dr. Martinez, and Gonzaba. Thus, at the time of trial, the remaining claims were Puente's claims against Dr. Virlar, Dr. Martinez, and Gonzaba.

At trial, Puente's experts testified the failure of Dr. Virlar, Dr. Martinez, and Dr. Patel to recognize the risks or symptoms of Wernicke's encephalopathy and to replenish thiamine proximately caused Puente's permanent brain injury and neurological deficits for which Puente

---

[8] During the proceeding, the trial court appointed guardians ad litem for Puente and her minor daughter, respectively.
[9] Maria Ester Carr brought suit individually and as guardian of Puente's minor daughter.
[10] These healthcare providers were Dr. Nilesh Patel; James Houston, P.A.; Angela Garcia, R.D.; NITYA Surgical Associates, PLLC d/b/a Texas Bariatric Specialists, LLC; Manuel Martinez, M.D.; Methodist Healthcare System of San Antonio, Ltd. d/b/a Metropolitan Methodist Hospital; and "JKD" (an unknown registered dietician identified only by initials on medical records).

will require twenty-four-hour care for the rest of her life. According to Puente's experts, her thiamine deficiency was reversible from the time of her admission on January 14, 2012 until her discharge on January 26, 2012. However, after January 26th, her injuries were permanent.

Dr. Virlar and Gonzaba's defense at trial was that Puente had never suffered from Wernicke's encephalopathy but was suffering some other condition that no health care provider could have foreseen or prevented.[11] They emphasized that over two dozen healthcare providers had seen or treated Puente since her surgery, but none diagnosed her with Wernicke's until after January 26, 2012. Dr. Virlar testified that he took no responsibility for Puente's injuries, stating that he did his "best with the team" and they did what they "could under the circumstances." Dr. Virlar testified, "And I still agree that it is not Wernicke's encephalopathy–that she suffered a stroke."

The jury returned a verdict in favor of Puente; it found that Dr. Patel was 40% responsible; Dr. Virlar was 60% responsible; and Dr. Martinez was 0% responsible.[12] The jury awarded Puente $133,202.00 for past loss of earning capacity; $888,429.00 for future loss of earning capacity; and $13,263,874.86 for future medical expenses. Dr. Virlar and Gonzaba then filed a motion for settlement credit, arguing that the settlement paid to Puente's minor daughter by the hospital

---

[11] Defense expert, Dr. Darryl S. Camp, a neurologist, testified that after reviewing Puente's medical records, he believed she was suffering from Guillain-Barre syndrome. Puente's experts, on the other hand, testified she could not have been suffering from Guillain-Barre syndrome. According to Dr. Wenzell, the "typical presentation for Guillain-Barre syndrome is gradual evolution over several days to two weeks of ascending–meaning starting at the bottom and moving up–symptoms of numbness and weakness in the extremities, sometimes people can have eye movement abnormalities as well, and the diagnosis is confirmed by the presence of elevated protein [in] the spinal fluid and by certain electrical abnormalities where the nerves are tested." Dr. Wenzell testified Puente had no elevated spinal fluid protein and no "abnormality of nerve conduction studies." According to Dr. Wenzell, there was no support in Puente's medical records for a diagnosis of Guillain-Barre syndrome. Similarly, Dr. Altman testified that Puente was not suffering from Guillain-Barre syndrome because "Guillain-Barre doesn't cause mental confusion"; "by definition" it "affects only the peripheral nerves" and "has no effect on the central nervous system, the brain." Thus, it does not "cause confusion, behavioral changes, things of that nature." "Also, it's not going to be associated with spasticity," which was one of Puente's problems–"she's spastic in her arms and legs."

[12] During Puente's January 2012 hospitalization, Dr. Martinez saw Puente for only the first two days of the two-week window in which her condition could have been reversed.

should be applied as a credit against the judgment. Dr. Virlar and Gonzaba also filed a motion for order of periodic payments. After a hearing, the trial court denied both motions. The trial court then signed a judgment against Dr. Virlar and Gonzaba, awarding Puente $14,109,349.02 in damages.[13]

Dr. Virlar and Gonzaba then filed post-judgment motions, including a motion for new trial, motion for remittitur, motion for judgment notwithstanding the verdict, and motion to modify the judgment. The trial court denied all their motions. They then appealed.

### EXCLUSION OF EXPERT TESTIMONY

In their first issue, Dr. Virlar and Gonzaba argue the trial court erred in excluding deposition testimony from Dr. Ralph W. Kuncl, who would have testified about the liability of responsible third parties. "We review a trial court's exclusion of an expert witness's testimony for an abuse of discretion." *Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018). "A trial court abuses its discretion by failing to follow guiding rules and principles." *Id.* "To reverse a trial court's judgment based on the exclusion of evidence, we must find that the trial court did in fact commit error, and that the error was harmful." *Id.*

Here, Dr. Virlar and Gonzaba argue that Dr. Kuncl's testimony was relevant to responsible third parties in this case. Section 33.004 of the Texas Civil Practice and Remedies Code permits a defendant to seek to designate a person as a responsible third party by filing a motion for leave to designate that person on or before the 60th day before the trial date. TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(a). Section 33.003(a) requires a jury to determine, as to each cause of action asserted, "the percentage of responsibility, stated in whole numbers," for each claimant, each

---

[13] The jury awarded $14,285,505.86 in compensatory damages, of which $133,202.00 was for damages incurred in the past. The trial court awarded prejudgment interest, but also reduced the award by a $200,000.00 settlement credit relating to Puente's settlement with Dr. Patel. The net judgment was for $14,109,349.02. The judgment also awarded Puente court costs and post-judgment interest at the annual rate of 5% compounded annually.

defendant, each settling person, and "each responsible third party who has been designated under [s]ection 33.004." *Id.* § 33.003(a). Section 33.003(b), however, "does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission." *Id.* § 33.003(b).

Dr. Virlar and Gonzaba pled the alleged responsibility of twenty-six different health-care providers. Pursuant to section 33.003(b), they were not entitled to a jury submission on the conduct of these twenty-six alleged responsible third parties unless at trial there was "sufficient evidence to support the submission." *Id*. Dr. Virlar and Gonzaba argue on appeal they were denied that opportunity because the trial court excluded their evidence in the form of Dr. Kuncl's deposition testimony.

### A. Standards for Expert Testimony in Medical Malpractice Cases

"Recovery in a medical malpractice case requires proof to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 860 (Tex. 2009). "Proximate cause includes two components: cause-in-fact and foreseeability." *Id*. "Proof that negligence was a cause-in-fact of injury requires proof that (1) the negligence was a substantial factor in causing the injury, and (2) without the act or omission, the harm would not have occurred." *Id*. "Thus, to satisfy a legal sufficiency review in such cases, plaintiffs must adduce evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)). "In medical-malpractice cases, the general rule is that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Id.* (citations omitted).

A person is qualified to give opinion testimony concerning the causal relationship between the alleged injury and the alleged departure from the applicable standard of care only if the person meets the requirements of section 74.402 of the Texas Civil Practice and Remedies Code and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402; *Diagnostic Res. Group v. Vora*, 473 S.W.3d 861, 868 (Tex. App.—San Antonio 2015, no pet.). To be so qualified under Texas Rule of Evidence 702, an expert must have "knowledge, skill, experience, training, or education," regarding the specific issue. TEX. R. EVID. 702; *see Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996). Further, the expert's testimony must be reliable. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 555 (Tex. 1995) ("To constitute 'scientific knowledge,' the proffered testimony must be reliable."). In determining whether expert testimony is reliable, courts may consider the nonexclusive factors set out in *Robinson* regarding scientific theories and techniques,[14] as well as the expert's experience. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). When the *Robinson* factors do not readily lend themselves to a review of the expert's opinion, expert testimony is unreliable if there is simply too great an "analytical gap" between the foundational data and the opinion proffered. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726-27 (Tex. 1998).

Finally, an expert's testimony cannot be conclusory. "An expert's testimony is conclusory if the witness simply states a conclusion without an explanation or factual substantiation." *Bustamante*, 529 S.W.3d at 462. "If no basis for the opinion is offered, or the basis offered provides

---

[14] *Robinson*'s list of nonexclusive factors include (1) the extent to which the theory has been or can be tested, (2) the extent to which the technique relies upon the subjective interpretation of the expert, (3) whether the theory has been subjected to peer review and/or publication, (4) the technique's potential rate of error, (5) whether the theory or technique has been generally accepted as valid by the relevant scientific community, and (6) the non-judicial uses which have been made of the theory or technique. *Robinson*, 923 S.W.2d at 557.

no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Id.* "It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury." *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010). "The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury." *Id*. "Stated differently, an expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of the statements to link the conclusions to the facts." *Bustamante*, 529 S.W.3d at 462.

### B. Did the offer of proof presented by Dr. Virlar and Gonzaba meet these standards?

Dr. Kuncl, a neurologist, was an expert designated and retained by Puente, and not by Dr. Virlar or Gonzaba. Even though Dr. Kuncl was not their retained witness, Dr. Virlar and Gonzaba argued at trial that Dr. Kuncl's deposition testimony was relevant to the breach of standard of care (1) in failing to recognize the signs and symptoms of thiamine deficiency, and (2) in failing to order thiamine replenishment. Puente objected, arguing that Dr. Kuncl, as a neurologist, was not qualified to testify about the standard of care required of the twenty-six different healthcare providers, including nurses and emergency room physicians, who did not practice in the area of neurology. Further, Puente argued Dr. Kuncl's deposition testimony was too general and not sufficiently specific because his testimony did not address the standard of care and breach for each responsible third party. The trial court sustained Puente's objections. Dr. Virlar and Gonzaba then made an offer of proof.[15] The offer of proof included an Amended Designation of Deposition and

---

[15] Puente contends Dr. Virlar and Gonzaba have failed to preserve error on this issue because they withdrew Dr. Kuncl as a witness. In reviewing the record, we conclude that counsel for Dr. Virlar and Gonzaba did not withdraw Dr. Kuncl as a witness. Instead, counsel was merely recognizing that the trial court had already sustained two objections made by Puente to Dr. Kuncl being qualified to testify about the liability of other physicians, i.e. the responsible third parties. Defense counsel was recognizing that based on the trial court's rulings, it did not make sense to continue line by line through Dr. Kuncl's deposition testimony. Thus, he "withdrew" the remaining deposition excerpts and made an offer of proof of what Dr. Kuncl would have testified about. We find no waiver by Dr. Virlar and Gonzaba.

Video Testimony of Ralph W. Kuncl, Ph.D., M.D., and the actual excerpts from Dr. Kuncl's deposition testimony.

On appeal, Dr. Virlar and Gonzaba point to excerpts of Dr. Kuncl's deposition testimony in support of their argument that the trial court erred in excluding his testimony. They refer to where Dr. Kuncl testified he was "critical of every physician, every nurse, every dietician, every member of the team that cared for Ms. Puente." However, Dr. Kuncl could not explain those criticisms. When asked about a specific physician, Dr. Kuncl admitted that he had not reviewed the records related to that physician, so he could not comment on that physician's care. Nevertheless, when asked whether he would be "critical" of that physician for failing to recognize the risk of thiamine deficiency and to order replacement thiamine if that physician had seen Puente during her hospital admissions on January 14 and February 3, 2012, Dr. Kuncl replied, "Yes." According to Dr. Kuncl, he would have the same criticisms of emergency room physicians who saw Puente "[i]f they knew that she had altered anatomy and nausea and vomiting." Dr. Kuncl testified that his "criticisms extend to, virtually, everyone who was involved as a team caring for her and all who saw her, because every one of them had the chance that they missed to recognize the risk and the curative benefit of thiamine and the zero risk of administering thiamine." The attorney questioning Dr. Kuncl during the deposition pointed out that Dr. Kuncl's statements constituted a "general response":

> Q: *And I appreciate your general response, but I want to go through each physician.* So, you are critical and believe Dr. Lindsey, the emergency room physician or the physician at Val Verde Regional Medical Hospital, was negligent and below the standard of care?

> A: Yes, *if you'd allow me a caveat. Obviously, some physicians and therapists had vanishing little time to spend with her*, so I can't tell you how long that Dr. Lindsey spent with Jo Ann Puente. But every person who had a moment or a hand on her had a chance to reverse an otherwise fatal disease. *I'm*

*guessing that there are going to be levels of liability dependent on the nature of the continuing care provided and how integral a part of the team, the bariatric surgical team*, they were. So, you'll list a lot of names and I'm going to say they're all responsible in a way because they all had a chance to give her repletion doses of thiamine.

(emphasis added). Dr. Kuncl later testified again he was "critical" of every physician who saw Puente during her admissions in January and February 2012 "*with the caveat that her stays at Val Verde were very short*." (emphasis added).

The above testimony by Dr. Kuncl is general in nature and does not explain how and why a specific physician breached the applicable standard of care and proximately caused Puente's injuries. *See Bustamante*, 529 S.W.3d at 462. Dr. Kuncl admitted this general response cannot apply to all the healthcare providers. Although Dr. Kuncl testified that all the physicians were liable for Puente's injuries because they were part of a "team," he then admitted that some physicians had "vanishing little time to spend with her" and he was "guessing that there are going to be levels of liability dependent on the nature of the continuing care provided and *how integral a part of the* team, the bariatric surgical team, they were." (emphasis added). Thus, Dr. Kuncl gave general statements of every member of the "team" being held responsible, while also admitting that some members of the team would have different "levels of liability" based on the circumstances presented. Dr. Kuncl, however, does not go through these circumstances and specifically explain the standard of care applicable to each alleged responsible third party and how that alleged responsible third party breached the standard and proximately caused Puente's injuries. Thus, the above testimony by Dr. Kuncl is general and conclusory; it is therefore not considered "probative evidence, regardless of whether there is no objection." *Bustamante*, 529 S.W.3d at 462.

Dr. Virlar and Gonzaba also point to where Dr. Kuncl was asked whether he believed "all the physicians should have been aware of . . . the high risk for thiamine deficiency" to Puente. Dr. Kuncl, replied, "Yes, *because the literature and common medical knowledge* in the era of post-bariatric surgery always lists such patients, especially those with malabsorption surgery like Roux-en-Y procedure, as those being listed to be at high risk for thiamine depletion." (emphasis added). Thus, Dr. Kuncl testified that *all physicians* should be *aware* of the high risk posed to Puente, but did not specifically detail how the alleged responsible third parties in question failed to appreciate that risk. Dr. Kuncl admitted that the amount of time spent with Puente would be a "caveat" to his answer. Again, Dr. Kuncl's testimony is general and conclusory. *See Bustamante*, 529 S.W.3d at 462.

Dr. Virlar and Gonzaba also point to where Dr. Kuncl in a conclusory fashion agreed to the following statements:

- And you're critical of all of those physicians and their failure to replete the thiamine?
- And do you believe that their failure to do was a cause, in fact, of Mrs. Puente's neurological deficits and current condition?
- If Dr. Silva was at the bedside on January 18th, would you be critical of him for not diagnosing Wernicke's encephalopathy?
- Are you critical of the ophthalmologist who saw her as an outpatient specifically evaluating this presentation to include ocular disorders?

In response to all these statements, Dr. Kuncl simply replied, "Yes." His agreement with these conclusory statements cannot be considered probative evidence. *See Bustamante*, 529 S.W.3d at 462.

With respect to hospital staff, nurses, or dieticians, Dr. Kuncl testified that he did not expect the nurses or dieticians to make the diagnosis of Wernicke's encephalopathy; he did expect them "to be aware of the risk factors and the need to prophylax to prevent it." Thus his "criticism" was they did not recognize the risk factors or "make a recommendation to replete." Once again, Dr.

Kuncl's testimony is general and conclusory, and does not constitute probative evidence. *See Bustamante*, 529 S.W.3d at 462.

Given that the excerpts from Dr. Kuncl's deposition testimony presented in the offer of proof do not constitute probative evidence, Dr. Virlar and Gonzaba have failed to show the trial court erred in excluding Dr. Kuncl's deposition testimony.

### TEXAS RULES OF EVIDENCE 403 AND 404

In their second issue, Dr. Virlar and Gonzaba argue the trial court abused its discretion by allowing questions and admitting evidence regarding (1) Dr. Virlar's loss of privileges in violation of Texas Rule of Evidence 403; and (2) prior acts in treating other patients in violation of Texas Rule of Evidence 404.

#### A.  Rule 403: Loss of Privileges

According to Dr. Virlar and Gonzaba, Puente was allowed to ask Dr. Virlar repeatedly whether he had lost his privileges at Methodist Hospital, which they contend was "clearly intended to mislead the jury into believing Dr. Virlar had lost his privileges as a result of Puente's care."

##### 1.  Did Dr. Virlar and Gonzaba preserve error for appeal?

Puente argues that Dr. Virlar and Gonzaba did not preserve this issue for appeal. In response, Dr. Virlar and Gonzaba contend they did preserve error and point to the portion of the reporter's record where the trial court ruled on motions in limine. A ruling on a motion in limine, however, does not preserve error for appeal. It "is designed solely to require an offering party to approach the bench and inquire into the admissibility of the evidence at issue before introducing that evidence to the jury." *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509, 520 (Tex. App.—El Paso 2004, pet. denied). Accordingly, a ruling on a motion in limine "has no bearing on the ultimate admissibility of the evidence," *id.*, and "preserves nothing for review", *Kaufman v. Comm'n for Lawyer Discipline*, 197 S.W.3d 867, 873 (Tex. App.—Corpus Christi–

Edinburg 2006, pet. denied). Dr. Virlar and Gonzaba's argument that portions of the reporter's record relating to the motion in limine show they preserved error is without merit. *See id*.

Once trial began, the record reflects that during Dr. Virlar's testimony, Puente's attorney informed the trial court outside the presence of the jury that he was "going to get into [Dr. Virlar's] loss of privileges." Puente's attorney noted that defense counsel had been allowed to ask his expert witnesses, who were physicians, whether they had privileges at hospitals. Defense counsel objected and argued the question was unfair to Dr. Virlar because he was barred by peer privilege from explaining why his privileges had been revoked. Defense counsel argued the question, "Do you have privileges now at Methodist?" was "[p]robably an appropriate question," because it "does not get into the peer review process." However, the question, "Were your privileges revoked?" did get into "an action by a peer review committee." Defense counsel then made an objection pursuant to rule 403:

> And, Judge, in addition to privilege, let me add something else. Under the rule–and I'm– I believe, in this case, prejudicial effect of this line of inquiry far exceeds any probative value it may have in this case. If he asks the question: "Did you lose privileges?", and I do not respond with a question like, "Did it have anything to do with this case?"–which it–manifestly did not. It was two years later–if I don't ask that question, the jury is going to speculate about why he lost his privileges, and certainly going to speculate that it had something to do with his care of Ms. Puente. So you have a huge prejudicial effect out of a simple small question there. If he answers then, "No, it had nothing to do with this case," arguably, I'm opening the door for [Puente's attorney] to come back and say, "Well, what did it have to do with?", and then we're back to the race going into things that the doctor is not permitted to talk about.

Puente's counsel then informed the trial court that he was "looking at Dr. Virlar's board of medical examiner site," and the information online showed Dr. Virlar "entered into an agreed order publicly reprimanding himself and requiring him to go back and complete 24 hours of continuing medical education, 8 hours in risk management, 8 hours in ethics, 8 hours in professional

communications, and pay an administrative fee." According to Puente's counsel, all the information was public record. The trial court then stated to defense counsel, "I hear your argument, but if it's something we can look up, how can we say that's privileged information and can no longer be discussed?" The trial court overruled defense counsel's objection.

Puente's counsel then stated that he was "not going to ask [Dr. Virlar] what it arose out of." He was "just going to ask [Dr. Virlar] . . . [whether he has] any privileges at any hospitals now?" Defense counsel replied that Dr. Virlar presently had privileges at two hospitals.

> COURT: Well, then, if the doctor has regained his privileges, then he regained his privileges. He can talk about that. But I don't want the trial–I don't want to try that case. And the actual intricate workings of the peer review of how the physician is not going to be–well, we don't know any of that information. We're not going to talk about that. We're not going to try that. I mean, we've got to keep it clean. You know, it's just have you–did you subsequently lose– and then they are going to come back and say, since then, you have gained it at some other hospitals. I'm going to give him some room to explain, if he feels like he wants to, you know, explain his–

> PLAINTIFF: Okay. But I just want to make everyone aware, if you open the door and try to explain it away, I'm going to get into the fact that he agreed to be disciplined.

> DEFENSE: And, again, it's not admissible. The facts in there are not admissible.

In the presence of the jury, Puente's attorney began questioning Dr. Virlar about privileges:

Q:  Okay. Doctor, what are privileges? When a hospital grants you privileges, what does that mean?
A:  It is a courtesy by the hospital that allows you to go into a hospital setting to evaluate patients.
Q:  Do you have to apply for those?
A:  Yes, sir.
Q:  Have you ever lost your privileges?
A:  Yes, sir.
Q:  How many times have you lost your privileges from hospitals?
A:  Once.

Q: And that was in 2014?
A: December of 2013.

Until this point in Dr. Virlar's testimony, any error has been preserved for appeal. Dr. Virlar's testimony was within the ruling of the trial court about what was admissible–that is, what Puente would be allowed to question Dr. Virlar about. *See* TEX. R. EVID. 103(b) ("When the court hears a party's objections outside the presence of the jury and rules that evidence is admissible, a party need not renew an objection to preserve a claim of error for appeal."); *see also Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 235-36 (Tex. 2007) (explaining that at a bench conference, the trial court ruled it would allow questions "about the prior patient's treatment to the extent that his statements concerning that treatment were inconsistent with his trial testimony," but that the cross-examination "went well beyond that limitation," thus requiring the attorney to object again to preserve the issue for appeal).

Puente's attorney then asked the question that is the basis of Dr. Virlar and Gonzaba's complaints on appeal:

Q: December of 2013. *So right after you took care of Jo Ann*?

DEFENSE: Objection, Your Honor. Can we approach?

PLAINTIFF: **I'll withdraw that, Your Honor.**

(emphasis added). Puente's attorney then continued his questioning about another subject without further comment by the defense. Thus, there was no evidence admitted here, and the trial court never ruled on the objection. If Dr. Virlar and Gonzaba believed the mere asking of the question was prejudicial, to preserve error, they needed to obtain a ruling on their objection, and if that objection was sustained, move for the trial court to instruct the jury to disregard the question. *See* TEX. R. APP. P. 33.1. They needed to request relief from the trial court at a point in the proceedings when the trial court could have cured any alleged error. *See* O'CONNOR'S TEXAS RULES–CIVIL

TRIALS, ch. 8, § 5, at 839 (2019) (explaining that (1) "[g]enerally, an improper question that is not answered by the witness does not constitute reversible error," (2) "[i]n most cases, the error in asking a prejudicial question can be cured by an instruction to the jury to disregard the question"; and (3) when the trial court sustains an objection, "to preserve error, the party should pursue an adverse ruling"). Thus, whether this question was unduly prejudicial is not preserved on appeal.

Finally, Dr. Virlar and Gonzaba point to where Puente's attorney again questioned Dr. Virlar about privileges:

> Q: Which hospital did you lose your privileges at?
> A: Methodist.
> Q: The one where you had taken care of–the one where Ms. Puente was?
> A: The Methodist Healthcare System.
> Q: Do you have those back?
> A: No, sir.

This evidence is within the ruling by the trial court and thus the rule 403 objection was preserved here. *See McShane*, 239 S.W.3d at 235-36.

In summation, the complained of testimony that has been preserved on appeal consists of testimony that Dr. Virlar lost his privileges, once, in December 2013, at Methodist Hospital and does not have those privileges back.

### 2. *Did the trial court abuse its discretion in ruling this testimony did not violate Rule 403?*

Texas Rule of Evidence 403 permits a trial court to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. Thus, "testimony is not inadmissible on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." *Diamond Offshore Servs. Ltd v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018) (quoting

*McShane*, 239 S.W.3d at 234). "Rather, *unfair* prejudice is the proper inquiry." *Id.* (emphasis in original). "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (citations omitted). "When determining the admissibility of evidence under rule 403, trial judges must balance the probative value of the evidence against relevant countervailing factors." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018).

We review a trial court's admission of evidence for abuse of discretion. *See Williams*, 542 S.W.3d at 542; *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016). A trial court abuses its discretion when it acts without regard for any guiding rules. *Caffe*, 487 S.W.3d at 142.

In arguing this testimony was unduly prejudicial under rule 403, Dr. Virlar and Gonzaba contend "[e]vidence of credentialing or the loss of privileges of a defendant physician to practice at a hospital are matters irrelevant and unduly prejudicial to that physician in a medical malpractice claim arising out of alleged negligence in the care and treatment of an unrelated patient." For support, they point to an unpublished opinion: *Neeble v. Sepulveda*, No. 01-96-01253-CV, 1999 WL 11710, at *6 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). In *Neeble*, the appellant argued the trial court erred because (1) it ordered a separate trial on the negligent credentialing and failure to monitor claims against the hospital from the negligence claims against the doctors; and (2) it ordered the appellant not to inform the jury of the claims against the hospital and of previous medical malpractice lawsuits against the appellee doctor. *Id.*

The court of appeals explained that "[t]he admission of evidence of previous claims and lawsuits is governed in part by Texas Rule of Evidence 404(b)," which precludes "a party from using evidence of other acts to prove a person acted in conformity with that past conduct." *Id.* The court concluded that "[t]he evidence of previous medical malpractice lawsuits against [appellee doctor] was, therefore, inadmissible in the current negligence action against him." *Id.* However,

the evidence was "admissible to prove the negligent credentialing and failure to monitor claims against" the hospital. *Id.* According to the court of appeals, "[b]ecause trying both claims simultaneously would have unduly prejudiced" appellee doctor, the trial court did not abuse its discretion in ordering separate trials and in ordering appellant to not inform the jury of the claims against the hospital and of previous medical malpractice lawsuits against appellee doctor. *Id.*

The facts presented in this appeal are distinguishable from those in *Neeble*. Here, there was no evidence of previous medical malpractice claims and lawsuits—the trial court explicitly limited the scope of the questions to just whether Dr. Virlar had lost his privileges and whether he had them now.

Further, Puente points out that Dr. Virlar testified as an expert witness on his own behalf. And, she emphasizes that the "qualifications of a medical expert include the nature and extent of his or her practice, including the existence or lack of hospital privileges." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401 (requiring expert witness testifying about accepted standards of medical care to be "qualified on the basis of training or experience," which includes whether the witness "has other substantial training or experience in an area of medical practice relevant to the claim" and "is actively practicing medicine in rendering medical care services relevant to the claim"); *Tenet Health Ltd. v. Zamora*, 13 S.W.3d 464, 472 (Tex. App.—Corpus Christi–Edinburg 2000, pet. dism'd w.o.j.) (explaining that "bestowment of hospital privileges does not mean a physician has an unlimited right to practice medicine in a particular hospital, but rather whether he is *qualified* to practice there according to the scope of the privileges") (emphasis in original). Indeed, as noted by Puente, defense counsel at trial acknowledged that he had asked all his experts about whether they have privileges. In reviewing the record, we hold that the trial court did not abuse its discretion in ruling Dr. Virlar's testimony that he had lost his privileges, once, in December 2013,

at Methodist Hospital and did not have those privileges back was not unduly prejudicial under rule 403.

### B. Rule 404: Prior Acts

In their second issue, Dr. Virlar and Gonzaba also complain that the trial court allowed Puente's attorney to question Dr. Virlar about "whether he had a history of not reading a patient's charting or examining the patient before administering treatment" in violation of rule 404. Puente again argues this issue is not preserved for appeal.

To preserve error for appellate review, the complaining party must (1) make a timely objection to the trial court that "state[s] the grounds for the ruling that the complaining party s[eeks] from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context," and (2) obtain an adverse ruling. *See* TEX. R. APP. P. 33.1.

In support of their argument that they did preserve error for appeal, Dr. Virlar and Gonzaba point to objections they made during a motion in limine:

> DEFENSE: Briefly, Your Honor, we would like to make an oral motion in limine relating to the testimony of Dr. Virlar. We would ask that the Court instruct counsel not to go into two issues. One is Dr. Virlar's prior lawsuit. . . . And the second thing is Dr. Virlar, in December of 2013, lost his privileges at Methodist Hospital. . . .

> [discussion about loss of privileges]

> COURT: What about the prior lawsuit?

> PLAINTIFF: The prior lawsuit, I intend to question him about a bunch of answers he gave in that deposition. I was not going to say "This is a case where you got sued and I was the lawyer for the plaintiff" or whatever. I was going to say, "Is it true you have given prior testimony regarding other patients? For example, in this other patient, you did X, Y, and Z, which is pretty much the same that [you] did here." And so, you know, that's what I'm going to do with it. I'm going to be asking about specific answers he gave in his deposition back then.

DEFENSE: Judge, this is going into a completely different character trait. If he is asking specific questions about the care of a patient during a prior lawsuit, then we're going to end up retrying the entire lawsuit, I mean, because then all that was done in that has to be re-justified, giving me another half a day that I've got to go into it. If he gives an answer to a question about this case that is contradicted by his answer on previous sworn testimony, that would certainly be permissible.

COURT: Well, obviously, we're not going to try the other lawsuit. You can talk about it. But I think – I mean, it's sworn testimony. It's got to be relevant in some sense to this one.

PLAINTIFF: It will be, Judge.

COURT: And so why don't you, I guess, on both of these issues – Mr. Anderson, do you have any case law about this that the defense would not be able to go into the loss of privileges at a hospital?

DEFENSE: Nothing directly on it. There is nothing. I can promise the Court I have looked. It's just general that all peer review is protected and privileged; and, therefore, we can't get to the records. We can't find out what was done or why, whether he did it voluntarily, or whether they were lost due to a problem totally unrelated to anything relevant to this case.

COURT: But your client can testify as to his understanding. I mean, if he lost his privileges or if he voluntarily, you know, decided not to practice at the hospital anymore. *And then on the prior lawsuit, Mr. Rhodes [Puente's counsel], why don't we approach at that point when you get to the point?*

(emphasis added). As noted previously, a ruling by the trial court on a motion in limine "does not preserve error on evidentiary rulings at trial because it does not seek a ruling on admissibility; rather, the purpose of such a motion 'is to prevent the asking of prejudicial questions and the making of prejudicial statements in the presence of the jury' without seeking the trial court's permission." *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 920 n.3 (Tex. 2015) (quoting *Hartford Accident & Indem. Co. v. McCardell*, 369 S.W.2d 331, 335 (Tex. 1963)). Thus, the above portions of the reporter's record do not show Dr. Virlar and Gonzaba preserved any complaint for appeal.

The parties continued their argument to the trial court:

PLAINTIFF: Let me give you an example: "Isn't it true that you have a history of prescribing to patients without seeing them or looking at the records?" That's one of the questions.

DEFENSE: Judge, it's totally irrelevant. There is no allegation that he did anything improper in prescribing to this patient. Th[ese are] other bad acts that are irrelevant to this case, and that kind of evidence is simply not permissible.

PLAINTIFF: He never read the records in this case. It's totally relevant. He has a history of it. He didn't read the records.

DEFENSE: Okay.

PLAINTIFF: So how is that not relevant?

DEFENSE: What are you contending he prescribed that hurt her?

PLAINTIFF: The prescription – he treated the patient in a way that injured the patient without looking at the patient or looking at the records.

DEFENSE: That's a prior bad act, Judge. It's one. There is no showing that it's a substantially similar circumstance. That kind of evidence should not be permitted.

COURT: *When you get to that point, Mr. Rhodes [Puente's counsel], please approach.*

(emphasis added). The trial court thus again made a ruling on a motion in limine; no error was preserved for appeal. *See Kaufman*, 197 S.W.3d at 873.

Dr. Virlar and Gonzaba also point to the following portions of Dr. Virlar's testimony at trial to show they preserved error for appeal:

PLAINTIFF: Can we approach, Your Honor?

COURT: Yes.

PLAINTIFF: I'm going to – this is where I want to ask him about his history of not looking at records and not examining patients before he prescribes treatment or renders treatment.

DEFENSE: And, again, Judge, it's past acts.[16] He has got one. There is no evidence of a history. It's just trying to get into some dirt that has no relevance to this case whatsoever -- one prior act that may be simple -- he hasn't established that he didn't examine the patient before he treated. So right now, it's not even relevant.

COURT: I mean, I'm going to allow you to try to lay a proper predicate.[17]

PLAINTIFF: Thank you.

Q. (By Plaintiff): Doctor, do you have a history in the past of–

DEFENSE: Excuse me, Your Honor. Can we approach? I'm sorry. I'm sorry. He is going to go to the history part of it going into a prior act. I thought what the Court said was that he could lay a predicate by establishing its relevancy in the presence. He can't do that by referring to the history. The question is, in this case, did he do what he is now saying he did in the past; and he hasn't established that yet. There is no predicate for that line of questioning.

PLAINTIFF: Your Honor, we have already laid the predicate, the fact that I asked him the question about the standard of care requiring him to look at the test and to look at the chart.

DEFENSE: He has not established that he didn't yet. That question and answer has not yet been had.

PLAINTIFF: Well, it's one of the two.

COURT: I need you to rephrase the question, a history of, you know.[18]

---

[16] Defense counsel appears to be objecting under Texas Rule of Evidence 404.

[17] This statement by the trial court is not a ruling on the admissibility of the evidence. The trial court was merely allowing Puente's counsel to lay a predicate.

[18] Similarly, this statement by the trial court is not an adverse ruling on the admissibility of the evidence. The trial court was merely asking Puente's counsel to rephrase the question for purposes of laying a predicate.

PLAINTIFF: Yes, Your Honor. I will rephrase it.

DEFENSE: Thank you.

Q. (By Plaintiff): Doctor, given your possibilities on the nutritional assessment that you either ignored it or you didn't look at it, do you sometimes, in other patients, not read the chart or examine the patient before you render treatment?

A. No, sir, usually we go through all the tabs to get the information that we need that's available at the time.

Q. Do you remember Charlotte Watson?

A. Yes, I do, sir.

Q. Isn't it true that you rendered treatment to her – that you rendered treatment to her without ever seeing her or without ever looking at her chart? That was a patient that was in the hospital for a knee surgery.

DEFENSE: Excuse me. Doctor, at this point, without going back into the old case, could you simply answer the question, please?[19]

WITNESS: Okay.

A. Can you repeat the question, please?

Q. (By Plaintiff) Did you render treatment to her, over the telephone from your couch, without looking at her or looking at her chart?[20]

A. Based on the information that the nurse provided to me over the phone regarding her clinical state and the clinical information that she had available at her disposal, yes, I did.

PLAINTIFF: Objection, nonresponsive, Your Honor.[21]

COURT: Sustained.

---

[19] Defense counsel did not object to the question; instead, he instructed his client to answer the question.
[20] Defense counsel did not object.
[21] Defense counsel did not object. The objection sustained was made by Puente's counsel.

Thus, defense counsel did not object to the question about whether Dr. Virlar treated Charlotte Watson "over the phone, without looking at her or looking at her chart." And, any error based on Dr. Virlar's answer is not preserved for appellate review.

The questioning continued:

Q. (By Mr. Plaintiff): Did you render treatment to her from your couch at home without seeing the patient or looking at her chart, "yes" or "no"?

A. Yes.

Q. Thank you. Do you do that a lot?

DEFENSE: Your Honor, objection, this goes –

COURT: I didn't hear the comment.

PLAINTIFF: The question was: Does he do it a lot?

DEFENSE: Your Honor, we're now opening up the entire practice.[22]

COURT: Overruled.

Q. (By Plaintiff) Do you do that a lot?

A. No, sir.

Thus, defense counsel obtained an adverse ruling to the question regarding whether Dr. Virlar treats patients "a lot" without looking at their chart or seeing them. However, Dr. Virlar responded that he did not practice that way. As Dr. Virlar did not agree with the question, any error from the asking of the question is harmless.

Puente's counsel continued his questioning of Dr. Virlar:

Q. Because that's not the way you're supposed to practice medicine, is it? Is it?

---

[22] Defense counsel did not specifically object under rule 404. From the context, we can assume counsel meant rule 404.

A. Is that a question?

Q. Yes. That's not the way you're supposed to practice medicine, is it?

A. Which way?

Q. Where you render treatment to a patient without seeing the patient or looking at the chart.[23]

A. We render care of the patient based on the evaluation of the patient, and sometimes that may be via many means. Now, with social media, there is electronic means, over the phone. There is PubHelp. We may not have the chart at our disposal at the time.

Q. But you didn't have any of that with regard to Charlotte Watson, did you, none? You just rendered treatment over the phone without seeing her chart and without seeing the patient.

A. Yes, sir.[24]

Q. And you know what that resulted in, don't you?

DEFENSE: Your Honor, we're going well outside –

COURT: Sustained.

Thus, defense counsel obtained a ruling by the trial court to the question "And you know what that resulted in, don't you?" However, defense counsel did not obtain an adverse ruling. After the trial court sustained the objection made by defense counsel, Puente's counsel moved on to another topic. To preserve error, defense counsel would have needed to move to instruct the jury to disregard, and if the trial court complied, he would have then needed to move for a mistrial. *See* Tex. R. App. P. 33.1.

---

[23] No objection was made by defense counsel.
[24] No objection was made by defense counsel. Further, Dr. Virlar had already testified without objection about Charlotte Watson.

Dr. Virlar and Gonzaba point to no other portions of the record. Therefore, we find no abuse of discretion by the trial court.

### C.      Harmless Error

Even if we were to assume that the trial court erred in admitting the above evidence, any error was harmless. "Erroneous admission of evidence requires reversal only if the error probably (though not necessarily) resulted in an improper judgment." *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *see* TEX. R. APP. P. 44.1(a). "We review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *Nissan*, 145 S.W.3d at 144.

"Clearly, erroneous admission is harmless if it is merely cumulative." *Id.* "But beyond that, whether erroneous admission is harmful is more a matter of judgment than precise measurement." *Id.* "In making that judgment, we have sometimes looked to the efforts made by counsel to emphasize the erroneous evidence and whether there was contrary evidence that the improperly admitted evidence was calculated to overcome." *Id.*

In arguing the evidence about the loss of hospital privileges was harmful, Dr. Virlar and Gonzaba point to statements made by Puente's counsel during closing argument.[25] While Puente's counsel did refer to Dr. Virlar's loss of privileges, the focus of his closing argument was on the facts of this particular case and the symptoms exhibited by Puente during her hospitalizations. Further, in considering the entire record, we conclude this case did not turn on whether Dr. Virlar lost his privileges once and whether he had those privileges back at Methodist Hospital. This case

---

[25] Puente's counsel stated during closing argument, without objection, that the jury could "believe it when [Dr. Virlar] says he lost his privileges at every hospital in San Antonio and cannot practice in any hospital in this city." Dr. Virlar testified he was currently employed at Doctors Hospital of Laredo as a full-time hospitalist and also "as a local at Fort Duncan in Eagle Pass." He testified he also worked at a clinic in San Antonio. Thus, Dr. Virlar testified that he had "admitting privileges at Doctors Hospital in Laredo and Fort Duncan in Eagle Pass." When he is in San Antonio, he is "in the clinic and at the nursing facilities."

turned on whether Dr. Virlar breached the standard of care by failing to treat Puente for a thiamine deficiency.

Similarly, with regard to the evidence that Dr. Virlar rendered treatment to another patient over the phone without reviewing her chart, this case did not turn on that evidence, but instead turned on whether Dr. Virlar *in Puente's case* had failed to realize she was exhibiting signs of thiamine deficiency because he admittedly did not review nurses' notes or notes from the dietician and physical therapist.

At trial, Puente's counsel presented evidence from witnesses and Puente's medical records proving that during her hospitalizations, Puente exhibited classic signs of thiamine deficiency. Although nurses and the physical therapist wrote notes in her medical records documenting those symptoms and although a dietician recommended twice in her medical records to supplement her nutrition, Dr. Virlar admitted at trial he did not read those notes at the time and was thus unaware of Puente's many symptoms. He testified the symptoms were "not reported" to him. For example, Dr. Virlar admitted he had not read the nurses' notes regarding Puente not responding to questioning, having a "fixed gaze," and exhibiting abnormal eyeball movement. Dr. Virlar testified that when he was on the hospital floor, "it was never reported to [him]" and that if *he* had observed any nystagmus in her eyes during *his* exam, he would have documented it. Thus, while Dr. Virlar emphasized a "team approach"[26] to the medical professionals treating Puente, he admitted to not reading notes written by nurses, her physical therapist, and the dietician. For example, Dr. Virlar admitted he never looked at the progress note by the physical therapist reporting that Puente had exhibited a Trendelenburg gait. Dr. Virlar testified if the gait had been reported to him, he would

---

[26] When asked who was the "captain" of the team, Dr. Virlar testified that he was the "admitting attending physician," but then claimed "there is no real captain." "We work as a team. Basically, there is no like, hey, man, I'm the captain, you do what I say. It doesn't work that way." When pressed who was the physician of record, Dr. Virlar stated, "I was."

have looked into the symptom. Later during his testimony, Dr. Virlar admitted that at the time of Puente's hospitalization, he had not known what a Trendelenburg gait was and only recently learned about it.

Further, while Dr. Virlar claimed he would have documented a significant observation like nystagmus, he also claimed to have had a "general conversation" with Dr. Patel that he did not document in Puente's records. According to Dr. Virlar, he brought up putting Puente on TPN with Dr. Patel, but Dr. Patel wanted to keep advancing her oral diet: "I would discuss my concerns regarding the nutrition with Dr. Patel, who then advised me, based on his expertise, to basically give him more time to work on her diet." When asked why this conversation was not documented in Puente's medical records, Dr. Virlar testified that "[s]imply because it is not documented doesn't mean it was not discussed or considered." Puente's counsel responded, "What are you taught in medical school? If it ain't documented, it wasn't done, correct?" Dr. Virlar replied, "Yes and no. We cannot document every concern in the chart on every patient. The documentation is *for billing purposes*." (emphasis added). Puente's counsel attempted to clarify Dr. Virlar's testimony: "Your understanding is the notes you are recording in your progress notes are just for billing?" Dr. Virlar responded,

> No. The progress note serves two purposes. It is a diary of my actions, for me to document what I consider important and relevant, plus whatever other purpose my entry may serve for me. In addition, it also serves the purpose as a billing record to basically ensure to payers that I did see the patient at that time and that it is appropriate for me to bill for that visit.

Puente's counsel then asked, "Is one of the purposes of charting patient's care the continuity of care?" Dr. Virlar admitted that "[i]t helps with the continuity of care."

Not only had Dr. Virlar not documented this conversation with Dr. Patel regarding Puente's nutrition in her medical records, but Dr. Virlar also failed to mention it during his deposition. He

was asked during his deposition whether he recalled "[u]p until the time of discharge" "any specific conversations" he had with Dr. Patel about Puente. At the deposition, Dr. Virlar responded, "No." At trial, he claimed that after reviewing Puente's chart in preparation for his testimony, he had remembered the conversation with Dr. Patel. Puente's counsel then asked him whether he had reviewed Puente's chart before his deposition. Dr. Virlar testified he had not, but then admitted he could not recall. Dr. Virlar then clarified, "But I do remember the conversation with Dr. Patel."

Dr. Virlar's inconsistent testimony was so significant that defense counsel addressed the matter during closing argument:

> I need to do something now, and this is pretty painful for me. Dr. Virlar testified to conversations that he now remembers that he did not remember at the time of his deposition. One of two things is true. Either, as he said, that as he went through these records over and over again in the three weeks leading up to trial, he remembered some things that he had not remembered at the time of his deposition. The other thing that you could conclude and that I suspect [Puente's counsel] will suggest when he does the rebuttal portion is that Dr. Virlar made up some of those conversations. I can't read your minds. I don't know which way you're thinking about this. I will tell you if you believe he made up those conversations, that was wrong, and you have every right to be angry about that, because you're not supposed to do that under oath. And I can't endorse that, and I can't even try and defend that, and I won't. But recall your oath. What did you swear to do? Render a true verdict. The court is asking you, did the negligence, if any, of those doctors proximately cause the injury? Your concern with the evidence is five years ago, not what happened here last week. Five years ago. What you are entitled to do, and the court has told you this, you are the sole judges of the credibility of a witness. If you believe that Dr. Virlar was not reliable in his testimony, it is your right and indeed your duty to give no weight to anything that he said on that witness stand, no weight. That is your—that is the ability you have. What you cannot do consistent with your oath is to decide this case on the fact that you believe he did not tell you the truth.

Finally, Dr. Virlar testified without objection that he no longer works for his previous employer: "I was given two options: one to basically be terminated or one to resign. I took the termination letter so that they wouldn't be able to enforce the non-compete. If I had taken a resignation letter, I wouldn't have been able to practice in the hospitals in San Antonio."

Given this entire appellate record, we cannot conclude that any error in the admission of evidence complained of by Dr. Virlar and Gonzaba "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a). Thus, even if the trial court had erred in allowing the evidence, any error was harmless.

## LOSS OF FUTURE EARNING CAPACITY

In their third issue, Dr. Virlar and Gonzaba argue the judgment for loss of future earning capacity was supported by legally and factually insufficient evidence. "Lost earning capacity is an assessment of what the plaintiff's capacity to earn a livelihood actually was and the extent to which that capacity was impaired by the injury." *Hospadales v. McCoy*, 513 S.W.3d 724, 742 (Tex. App.—Houston [1st Dist.] 2017, no pet.). "Loss of past earning capacity is a plaintiff's diminished ability to work during the period between the injury and the date of trial." *Id.* "Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after trial." *Bituminous Cas. Corp. v. Cleveland*, 223 S.W.3d 485, 491 (Tex. App.—Amarillo 2006, no pet.); *see Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004, no pet.). "In order to support such a claim, the plaintiff must introduce evidence from which a jury may reasonably measure in monetary terms [her] earning capacity prior to injury." *Bituminous*, 223 S.W.3d at 491. "If the plaintiff's earning capacity is not totally destroyed, but only impaired, the extent of [her] loss can best be shown by comparing [her] actual earnings before and after [her] injury." *Id.* "Because the amount of money a plaintiff might earn in the future is always uncertain, the jury has considerable discretion in determining this amount." *Id.*; *see Tagle*, 155 S.W.3d at 519 (same).

To support an award of damages for loss of future earning capacity, the plaintiff can introduce evidence of (1) past earnings; (2) the plaintiff's stamina, efficiency, and ability to work with pain; (3) the weakness and degenerative changes that will naturally result from the plaintiff's injury; and (4) the plaintiff's work-life expectancy. *Perez v. Arredondo*, 452 S.W.3d 847, 862

(Tex. App.—San Antonio 2014, no pet.); *Tagle*, 155 S.W.3d at 519. "There must be some evidence that the plaintiff had the capacity to work prior to the injury, and that [her] capacity was impaired as a result of the injury." *Tagle*, 155 S.W.3d at 520.

In considering whether the evidence is legally sufficient to support the jury's finding of loss of future earning capacity, we examine the record for evidence and inferences that support the jury's finding and disregard all contrary evidence and inferences. *See id.* at 517. If there is more than a scintilla of evidence to support the jury's finding, the evidence is legally sufficient to support the jury's finding. *See id.* at 518.

With regard to whether the evidence is factually sufficient to support the jury's finding of loss of future earning capacity, we consider all the evidence in the record, both for and against the jury's finding. *See id*. The evidence is factually insufficient if the jury's finding "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id.* As the trier of fact, the jury "determines the credibility of the witnesses and the weight to be given their testimony, decides whether to believe or disbelieve all or any part of the testimony, and resolves any inconsistencies in the testimony." *Id.* Thus, when there is conflicting evidence, we defer to the jury as the trier of fact. *Id*.

Dr. Virlar and Gonzaba argue the evidence is legally and factually insufficient to support the jury's award of damages for loss of future earning capacity because the only evidence to support such an award was the testimony of Dr. Keith Fairchild, Puente's economist. Dr. Fairchild valued Puente's past and future loss of earning capacity, including her loss of employee benefits, at $1,013,631.00. The jury, however, awarded Puente $1,021,631.00, which is $8,000.00 more than Dr. Fairchild's valuation.

Dr. Fairchild testified that in making his calculations of Puente's loss of earning capacity, he assumed an average life expectancy based on vital statistics tables published by the Centers for

Disease Control and Prevention. He projected Puente to live until February 23, 2062. According to Dr. Fairchild, Puente could live longer than this average life span or she could live less than this average life span. Dr. Fairchild also assumed an inflation rate of 2.29 percent per year and a discount rate based on a seven-year U.S. Treasury bond, which he testified was a "middle of the road" investment model. He also projected the remaining work-life expectancy to be May 21, 2038, at which time Puente will be sixty-two years of age. According to Dr. Fairchild, he based Puente's work-life expectancy on average statistics reported by the government, including the Bureau of Labor Statistics, which take into account gender and educational level. He projected Puente's loss of future earning capacity to be $880,429.00. He testified his opinions were based on a reasonable degree of economic and financial probability. The jury awarded Puente $888,429.00 for loss of future earning capacity, which exceeds the range of Dr. Fairchild's testimony by $8,000.00.

In response, Puente argues that Dr. Virlar and Gonzaba incorrectly assert Dr. Fairchild's testimony was the only evidence of her loss of future earning capacity. She states that Dr. Altman, Dr. Gavi, and "appellants' own damage witness testified to various aspects of Jo Ann Puente's impairment, its duration, her life expectancy, and the composite of factors that may affect a person's capacity to earn, such as pain, weakness, and diminished functional ability." Puente, however, does not cite to the record where these witnesses gave testimony. *See* TEX. R. APP. P. 38.1(i). Nor does Puente explain how the testimony from these witnesses would affect Dr. Fairchild's calculations. It is undisputed that Puente was employed as an administrative assistant with the San Felipe Consolidated School District earning approximately $26,000 per year at the time of her injuries. It is also undisputed that due to her permanent injuries, she is wholly incapable

of working.[27] Thus, the extent of her impairment is really not at issue on appeal. *See Bituminous*, 223 S.W.3d at 491 (explaining that if a plaintiff's earning capacity is not totally destroyed, but only impaired, the extent of her loss is relevant). Further, the testimony in this case was Puente will have a longer life expectancy than her work-life expectancy. *See Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 38 (Tex. App.—Tyler 2003, pet. denied) (noting that work-life expectancy is a retirement age of 65 less the plaintiff's age). Therefore, whether Puente has a shorter or longer life expectancy does not affect the calculations regarding her *work-life* expectancy.

The jury's award of $888,429.00 exceeded the range of loss described by Dr. Fairchild, the expert witness, by $8,000. There is no other evidence in the record to support an award for this $8,000. A jury's award may not be based on conjecture and "must be based upon such facts as are available in the particular case" and "'proved with that degree of certainty of which the case is susceptible.'" *Koko Motel, Inc. v. Mayo*, 91 S.W.3d 41, 51 (Tex. App.—Amarillo 2002, pet. denied) (quoting *McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710, 712 (1943)). Thus, "where the plaintiff seeks special damages for loss of his earning capacity in a particular business or profession, the amount of his earnings or the value of his services in that business must be shown with reasonable certainty." *Id*. at 52 (quoting *McIver*, 169 S.W.2d at 712). Here, by awarding damages in excess of the range of evidence, the jury abused its discretion. *See id*.

---

[27] We note that Puente also makes an invited error argument in her brief. She points to Dr. Fairchild's testimony about the discount rate he used and Dr. Fairchild's acknowledgment that some economists use discount rates lower than the one he used in making his calculations. Puente then points to defense counsel's statements during closing argument where he stated to the jury: "With regards to the investment part and using T-bills, again use your common sense." Puente argues that defense counsel "invited the jury to use its own 'common sense' in choosing between putative investments and discount rates." According to Puente, the testimony "from over a dozen witnesses about [Puente]'s physical limitations and life expectancy, there was sufficient evidence to support the jury's judgment and any alleged error was invited and waived." We, however, find no invited error by defense counsel through the statement made during closing argument. Further, any statement made by defense counsel is not evidence.

We therefore hold there was sufficient evidence of loss of future earning capacity in the amount of $880,429.00, but not in the full amount awarded ($888,429.00). In *Virlar I*, 2020 WL 557735, at *33, we suggested a remittitur decreasing the award for loss of future earning capacity by $8,000.00. Puente then filed a remittitur in the amount of $8,000.00. As we did in *Virlar II*, 2020 WL 2139313, at *1, we accept this remittitur and modify the trial court's judgment to reflect that Puente recover damages against appellants for loss of future earning capacity in the amount of $880,429.00. *See* TEX. R. APP. P. 46.3, 46.5. We do not disturb any other damages awarded by the jury.

SETTLEMENT CREDIT

Under a confidential settlement, Puente's minor daughter, C.P., received a sum of money from the hospital.[28] Puente, C.P., and Carr (Puente's mother) then dismissed all their claims against the hospital. On appeal, Dr. Virlar and Gonzaba argue that the dollar amount of the settlement paid to C.P. should be deducted from the amount awarded to Puente pursuant to chapter 33 of the Texas Civil Practice and Remedies Code. In response, Puente argues that Dr. Virlar and Gonzaba did not meet their burden of proving they were entitled to the settlement credit because they did not introduce evidence of the settlement amount. Puente further argues that even if they did show the settlement amount, the amount of her daughter's settlement for her daughter's independent damages should not reduce her award for injuries she suffered as a result of Dr. Virlar and Gonzaba's negligence.

### A. Chapter 33's Settlement Credit Provisions

Section 33.012(c) of the Texas Civil Practice and Remedies Code provides that if a claimant in a health care liability claim has settled with one or more persons, the amount recovered

---

[28] Because the settlement amount is part of a confidential settlement, we do not refer to the exact amount in this opinion.

by the claimant should be reduced "by an amount equal to one of the following, as elected by the defendant: (1) the sum of the dollar amounts of all settlements; or (2) a percentage equal to each settling person's percentage of responsibility as found by the trier of fact." TEX. CIV. PRAC. & REM. CODE ANN. § 33.012(c). "Claimant" is defined as

> a person seeking recovery of damages, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff. In an action in which a party seeks recovery of *damages for injury to another person*, damage to the property of another person, the death of another person, or other harm to another person, "claimant" includes:
>> (A) the person who was injured, was harmed, or died or whose property was damaged; and
>> (B) *any person who is seeking, has sought, or could seek recovery of damages for the injury, harm, or death of that person* or for the damage to the property of that person.

*Id.* § 33.011(1) (emphasis added). A "settling person" is "a person who has, at any time, paid or promised to pay money or anything of monetary value to a claimant in consideration of potential liability with respect to the personal injury, property damage, death or other harm for which recovery of damages is sought." *Id.* § 33.011(5).

### B. Same Burden Under Chapter 33 and One-Satisfaction Rule

Chapter 33 is based on the one-satisfaction rule, a common-law doctrine, but it is more narrowly applied. *See In re Xerox Corp.*, 555 S.W.3d 518, 523 (Tex. 2018) (orig. proceeding) (explaining that "chapter 33's proportionate-responsibility scheme . . . incorporates the one-satisfaction rule"); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 33.002(a) (applying only to a "cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought" or an action brought under the DTPA "in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought"). The one-satisfaction rule is a common law rule providing that "a plaintiff is entitled to only one recovery for any damages

suffered." *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 106 (Tex. 2018). This is true even though "more than one wrongdoer contributed to bring about his injuries." *Id.* at 107 (citations omitted). The "fundamental consideration in applying the one-satisfaction rule is *whether the plaintiff has suffered a single, indivisible injury*—not the causes of action the plaintiff asserts." *Id.* (emphasis added). Thus, the one-satisfaction rule "applies both when the defendants commit the same act as well as when defendants commit technically differing acts which result in a single injury." *Id.* (citations omitted). This rule applies to settlement credits for nonsettling defendants because the "plaintiff should not receive a windfall by recovering an amount in court that covers the plaintiff's entire damages, but to which a settlement defendant has already partially contributed." *Id.* (citations omitted). "The plaintiff would otherwise be recovering an amount greater than the trier of fact determined would fully compensate for the injury." *Id.* (citations omitted).

Because chapter 33 is silent about which party has the burden to prove the settlement amount, the supreme court has looked to the common law's one-satisfaction rule. *See Utts v. Short*, 81 S.W.3d 822, 828 (Tex. 2002); *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998). Under the common law's one-satisfaction rule, "a defendant seeking a settlement credit has the burden of proving its right to such a credit." *Ellender*, 968 S.W.2d at 927. This burden "includes proving the settlement credit amount." *Id*. In applying this common-law burden to chapter 33, the supreme court has held that a defendant meets this burden if "the record show[s], in the settlement agreement or otherwise, the settlement credit amount." *Utts*, 81 S.W.3d at 828.

"Once the nonsettling defendant demonstrates a right to a settlement credit, the burden shifts to the plaintiff to show that certain amounts should not be credited because of the settlement agreement's allocation." *Sky View*, 555 S.W.3d at 107 (citing *Utts*, 81 S.W.3d at 828). "The plaintiff can rebut the presumption that the nonsettling defendant is entitled to settlement credits

by presenting evidence showing that the settlement proceeds are allocated among defendants, injuries, or damages such that entering judgment on the jury's award *would not provide for the plaintiff's double recovery*." *Id.* at 107-08 (citations omitted) (emphasis added). "A written settlement agreement that specifically allocates damages to each cause of action will satisfy this burden." *Id.* at 108.

The supreme court has explained that a "nonsettling party should not be penalized for events over which it has no control." *Id.* (quoting *Utts*, 81 S.W.3d at 829). "Thus, this burden-shifting framework, based on the presumption that the nonsettling defendant is entitled to a settlement credit after it introduces evidence of the plaintiff's settlement, is appropriate because the plaintiff is 'in the best position' to demonstrate why rendering judgment based on the jury's damages award would not amount to the plaintiff's double recovery." *Id.* "If the plaintiff fails to satisfy this burden, then the defendant is entitled to a credit equal to the entire settlement amount." *Id.*

### C. Did Dr. Virlar and Gonzaba meet their burden of showing the amount of the settlement credit?

Puente argues Dr. Virlar and Gonzaba did not meet their burden to show entitlement to the settlement credit, because the settlement amount is not in the record, was not offered in evidence, and was not stipulated to by the parties. In response, Dr. Virlar and Gonzaba point to the supreme court's opinion in *Ellender*, 968 S.W.2d at 927, where the court recognized chapter 33 did not require proof of a settlement "by a judicial admission, a stipulation, judicial notice, or properly admitted documents or testimony." *Id.* According to the court, "neither chapter 33 nor existing case law demand[ed] such proof." *Id.* For the defendant to meet its burden, the record need only "show, in the settlement agreement *or otherwise*, the settlement credit amount." *Id.* (emphasis

added). In reviewing its appellate record, the supreme court concluded the defendant had met its burden of showing a settlement amount:

> The record here shows that [the defendant] first informed the trial court of the $500,000 settlement amount when the [plaintiffs'] attorneys announced the settlement in open court during trial. Later, [the defendant's] written opposition to the [plaintiffs'] motion for judgment included the settlement amount. The [plaintiffs] did not contest the $500,000 settlement amount. Thus, we conclude that by placing the uncontested settlement amount in the record, [the defendant] met its burden of proof on the settlement amount.

*Id.*

Similarly, here, at the November 2, 2017 hearing, defense counsel informed the trial court that the hospital had settled with C.P. for a specified amount,[29] and "[a]ll the people suing [the hospital had] dismissed [their claims] with prejudice." Puente's counsel objected to defense counsel revealing the confidential amount in open court but did not dispute the amount was accurate. Because the amount placed in the record was uncontested by Puente, we conclude Dr. Virlar and Gonzaba met their burden of showing the settlement amount of C.P.'s settlement with the hospital. We thus must consider whether Puente's award should be reduced by the amount of C.P.'s settlement.

### D.       *Post-Verdict Motion for Settlement Credit and Puente's Response*

On October 20, 2017, Dr. Virlar and Gonzaba filed a post-verdict motion for settlement credit, arguing the amount of C.P.'s settlement with the hospital should be credited against Puente's award. On October 31, 2017, Puente filed a written response to the motion, arguing the amount of C.P.'s settlement should not be credited against her award for the following reasons: (1) because C.P.'s cause of action was separate and independent of Puente's common law medical malpractice action, section 33.012(c) did not apply; and (2) even if section 33.012(c) did apply,

---

[29] The record reflects that defense counsel informed the trial court of the exact amount of the settlement.

"any attempt to reduce one person's claim or cause of action by the amount received by another person on a separate and independent cause of action violates not only relevant statutes and common law, but also [Puente]'s rights under the Texas and U.S. Constitutions, including their respective due process, due course of law, equal protection, equal rights, jury trial, and open courts provisions." After hearing all the arguments of counsel, the trial court denied Dr. Virlar and Gonzaba's motion for settlement credit without stating its reasoning.

On appeal, Dr. Virlar and Gonzaba argued in their appellants' brief that section 33.012(c) applied to the facts of this case and that the constitutional objections raised by Puente in the trial court were meritless because section 33.012(c) "was a valid exercise of the Legislature's police power." We conclude, however, that as applied to the facts raised in this appeal, application of section 33.012(c) violates the open courts provision of the Texas Constitution.

### 1. The Texas Supreme Court first holds a statutory damages cap violates the Open Courts Provision in Lucas.

The Open Courts Provision of the Texas Constitution provides that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13. In *Lucas v. United States*, 757 S.W.2d 687, 687 (Tex. 1988), the Texas Supreme Court first recognized that a statute may violate the Open Courts Provision by restricting a plaintiff's recovery of damages in a medical malpractice action. In *Lucas*, a fourteen-month-old infant was paralyzed as the result of a federal army medical center improperly giving him a shot of antibiotics. *Id*. at 688. The child's parents brought a lawsuit in their individual capacities and as next friend of their son. *Lucas v. United States*, 811 F.2d 270, 271 (5th Cir. 1987). After a trial, the federal district court awarded the parents economic damages for medical expenses they had incurred and would incur until their son reached eighteen years of age. *Id*. The district court also awarded the son the following economic damages: "$350,000 as the

present value of future medical expenses he will incur after his eighteenth birthday, and $600,000 as the present value of the impairment of his future earning capacity." *Id*. As for noneconomic damages, the district court awarded the son "$1.5 million for pain and suffering." *Id*. With respect to the parents' individual claims, the district court "made no findings concerning the parents' claims for their own mental anguish and loss of companionship." *Id*. Then, the "district court reduced the total award of damages against the United States by the $400,000 paid by Wyeth Laboratories to the Lucases in settlement of the state court suit." *Id*. On appeal, the Fifth Circuit certified the following question to the Texas Supreme Court: whether under these facts, application of former article 4590i's damages cap provision would be consistent with the Texas Constitution. *Lucas*, 757 S.W.2d at 688.

The supreme court explained that "there is no provision in the federal [C]onstitution corresponding to [the Texas] [C]onstitution's 'open courts' guarantee." *Id*. at 690. According to the court, the "open courts" "guarantee is embodied in Magna Carta and has been a part of our constitutional law since our republic." *Id*. The supreme court noted that in previously construing the Open Courts Provision, it had required a litigant to first show that he had "a cognizable common law cause of action that is being restricted." *Id*. (quoting *Sax v. Votteler*, 648 S.W.2d 661, 666 (Tex. 1983)). "Second, a litigant must show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute." *Id*. (quoting *Sax*, 648 S.W.2d at 666).

With regard to the first prong, the supreme court explained that "Texas courts have long recognized that victims of medical negligence have a well-defined common law cause of action to sue for injuries negligently inflicted upon them." *Id*. Thus, according to the court, "the remaining inquiry [was] whether the restriction on Lucas' right of recovery 'is unreasonable *or* arbitrary when balanced against the purpose and basis of the statute.'" *Id*. (quoting *Sax*, 648 S.W.2d at 666) (emphasis in original).

In reviewing the statute's language, the supreme court expressed its "first concern" was "that the legislature has failed to provide Lucas any adequate substitute to obtain redress for his injuries." *Id*. The court "reject[ed] any argument that the statute may be supported by alleged benefits to society generally." *Id.* While some may argue there was "a societal *quid pro quo* in that loss of recovery potential to some malpractice victims is offset by 'lower insurance premiums and lower medical care costs for all recipients of medical care,'" the court emphasized "[t]his *quid pro quo* does not extend to the seriously injured medical malpractice victim and does not serve to bring the limited recovery provision within the rationale of the cases upholding the constitutionality of the Workmen's Compensation Act." *Id*. (citation omitted). And, in looking to other jurisdictions where statutes restricting the recovery of damages were upheld, the supreme court found "significant" that in those jurisdictions, "alternative remedies were provided," a fact which "weighed heavily in the decisions." *Id*. at 691. The supreme court noted that former article 4590i had been "based on recommendations of the Texas Medical Professional Liability Study Commission, sometimes referred to as the Keeton Report." *Id*. "Dean Keeton, in a separate statement, recommended a victim's compensation fund as a statutory substitute for limitations upon recovery." *Id*. The supreme court stressed that "[t]he legislature [had] chose[n] not to follow this recommendation." *Id*.

The supreme court then considered "whether the restrictions in sections 11.02 and 11.03 [of former article 4590i were] reasonable when balanced against the purposes and bases of the statute." *Id*. The court reasoned that "[t]he legislature, in enacting [former] article 4590i, apparently did not intend to strike at frivolous malpractice suits for it found in section 1.02(a)(2) that 'the filing of *legitimate* health care liability claims in Texas is a contributing factor affecting medical professional liability rates.'" *Id*. (quoting former article 4590i, § 1.02(a)(2)) (emphasis in original). The court noted "[t]he legislature did find that a 'medical malpractice insurance crisis'

had been created and that 'satisfactory insurance coverage . . . [was] often not available at any price,' but it then stated that 'adoption of certain modifications in the medical, insurance, and legal systems . . . *may or may not have an effect* on the rates charged by insurers for medical professional liability coverage.'" *Id*. (quoting former article 4590i, § 1.02(a)(5), (10), (12)) (alterations in original). The supreme court concluded,

> In the context of persons catastrophically injured by medical negligence, we believe it is unreasonable *and* arbitrary to limit their recovery in a speculative experiment to determine whether liability insurance rates will decrease. Texas Constitution article I, section 13, guarantees meaningful access to the courts whether or not liability rates are high. As to the legislature's stated purpose to "assure that awards are rationally related to actual damages," section 1.02(b)(2), we simply note that this is a power properly attached to the judicial and not the legislative branch of government. TEX. CONST. art. II, § 1.

*Lucas*, 757 S.W.2d at 691 (emphasis in original). The supreme court thus held that it was "unreasonable and arbitrary for the legislature to conclude that arbitrary damages caps, applicable to all claimants no matter how seriously injured, will help assure a rational relationship between actual damages and amounts awarded." *Id*.

In support of its holding, the supreme court pointed to language found in an opinion by the Supreme Court of Florida:

> Access to the court is granted for the purpose of redressing injuries. A plaintiff who receives a jury verdict for, e.g., $1,000,000, has not received a constitutional redress of injuries if the legislature statutorily, and arbitrarily, caps the recovery. Nor, we add, because the jury verdict is being arbitrarily capped, is the plaintiff receiving the constitutional benefit of a jury trial as we have understood that right. Further, if the legislature may constitutionally cap recovery at $450,000, there is no discernible reason why it could not cap the recovery at some other figure, perhaps $50,000, or $1,000, or even $1.

*Lucas*, 757 S.W.2d at 692 (quoting *Smith v. Dep't of Ins.*, 507 So.2d 1080, 1088-89 (Fla. 1987)). While the supreme court in *Lucas* understood "the legislature's concern in attempting to solve the health care problems it perceived during the middle of the 1970s," the court nevertheless concluded it was "simply unfair and unreasonable to impose the burden of supporting the medical care

industry solely upon those persons who are the most severely injured and therefore most in need of compensation." *Id*. (quoting *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825, 837 (1980)). Accordingly, the supreme court held that "the restriction [was] unreasonable *and* arbitrary and that [former] article 4590i, sections 11.02 and 11.03, unconstitutionally limit[ed] Lucas' right of access to the courts for a 'remedy by due course of law.'" *Id*. at 690 (quoting TEX. CONST. art. I, § 13) (emphasis in original). Therefore, the supreme court's answer to the Fifth Circuit's certified question was "that the limitation on medical malpractice damages in TEX. REV. CIV. STAT. ANN. art. 4590i, §§ 11.02 and 11.03, is inconsistent with and violative of article I, section 13, of the Texas Constitution." *Lucas*, 757 S.W.2d at 692.

### 2. *The Texas Supreme Court does not extend its holding in* Lucas *to statutory claims.*

Two years after its holding in *Lucas*, the supreme court "again consider[ed] the constitutionality of the damages provisions of the Medical Liability and Insurance Improvement Act, TEX. REV. CIV. STAT. ANN. art. 4590i, §§ 11.02 and 11.03 . . ., this time in the context of a wrongful death action." *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 842 (Tex. 1990). The court explained that in *Lucas*, it had held "statutory damages limitations are unconstitutional when applied to damages in common law medical malpractice actions." *Id*. (citing *Lucas*, 757 S.W.2d at 692). However, according to the court, its holding in *Lucas* "did not extend to wrongful death actions." *Id*. The court emphasized its "traditional distinction between common law personal injury and statutory wrongful death claims." *Id*. at 845. The court explained that it had "recognized this distinction in *Lucas*, restating the traditional rule that the [O]pen [C]ourts [P]rovision of our constitution applies only to common law claims." *Rose*, 801 S.W.2d at 845. According to the court, had it "faced a wrongful death claim in *Lucas*, [it] could not have reached the same conclusion, for the [O]pen [C]ourts [P]rovision does not apply to statutory claims." *Rose*, 801 S.W.2d at 845.

In applying the required two prong-analysis, the supreme court first considered whether the plaintiffs' remedy was "based upon a cognizable common law cause of action." The court explained that "[l]ike all actions based upon theories of negligence, the [wrongful death plaintiffs'] cause of action was a common law claim [that] would have died with [the decedent] had it not been preserved by the legislature in the wrongful death statute." *Id*. The plaintiffs' "remedy, therefore, was conferred by statute, not by the common law." *Id*. According to the court, because the plaintiffs did "not seek a common law remedy, the [O]pen [C]ourts [P]rovision [did] not apply to their wrongful death claim." *Id*.

Similarly, in *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 903 (Tex. 2000), the supreme court held the damages cap provision under former article 4590i did not violate the Open Courts Provision because the plaintiff had brought a claim under the survival statute. The supreme court explained that "all negligence actions are common-law claims" and that at common law, "no personal injury cause of action survived a victim's death." *Id*. The court concluded that "[b]ecause wrongful-death and survival actions would not exist absent legislative enactment, they are derived not from the common law but from a statute." *Id*. Thus, wrongful-death and survival claimants "cannot establish an open-courts violation because they 'have no common law right to bring either.'" *Id*. (quoting *Bala v. Maxwell*, 909 S.W.2d 889, 893 (Tex. 1995)).

### 3. *An amendment to the Texas Constitution permits limitation of noneconomic damages in suits against healthcare providers.*

In June 2003, the legislature enacted the Medical Malpractice and Tort Reform Act of 2003, otherwise known as House Bill 4, which provided for a statutory limitation on noneconomic[30] damages in medical malpractice lawsuits. *See* Act of June 2, 2003, 78th Leg., R.S.,

---

[30] Economic damages are damages intended to compensate the claimant for actual economic or pecuniary loss. TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(4). They do not include exemplary or noneconomic damages. Noneconomic damages are damages awarded to compensate the claimant for physical pain and suffering, mental or emotional pain

ch. 204, 2003 Tex. Gen. Laws 847; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.301 (limiting noneconomic damages as provided for by House Bill 4). Later that year, the Texas Constitution was amended to permit the Texas Legislature to cap noneconomic damages in civil lawsuits against healthcare providers. *See* TEX. CONST. art III, § 66. However, the amendment expressly did not apply to economic damages, which were defined as "compensatory damages for any pecuniary loss or damage" but did "not include any loss or damage, however characterized, for past, present, and future pain and suffering, mental anguish and suffering, loss of consortium, loss of companionship and society, disfigurement, or physical impairment." *Id*. § 66(a). Thus, *Lucas* and its progeny remain good law with respect to the recovery of *economic damages*; that is, pursuant to the Open Courts Provision of the Texas Constitution, the legislature may not restrict the recovery of economic damages in a common law medical malpractice action. *See Lucas*, 757 S.W.3d at 690-93 (explaining why limitation on recovery of damages in common-law medical malpractice action violates the open courts provision of Texas Constitution); *see also Horizon/CMS*, 34 S.W.3d at 903 (Tex. 2000) (explaining causes of action created by statute do not implicate open courts provision of constitution).

### 4. *Open Courts Analysis to Puente's Common-Law Medical Malpractice Action*

In applying the two-prong open courts analysis, we first note that Puente brought a medical malpractice cause of action against Dr. Virlar and Gonzaba, which is a common law cause of action that "Texas courts have long recognized." *Lucas*, 757 S.W.2d at 688. Thus, she has met the first prong. *See Horizon/CMS*, 34 S.W.3d at 902; *Weiner v. Wasson*, 900 S.W.2d 316, 317 (Tex. 1995); *Rose*, 801 S.W.2d at 842; *Lucas*, 757 S.W.2d at 690. With regard to the second prong, Dr. Virlar

---

or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses other than exemplary damages. *Id*. § 41.001(12).

and Gonzaba point to the fact that chapter 33's settlement credit provisions were enacted as part of House Bill 4's tort reform efforts to reduce costs to the health care industry. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 847. However, in *Lucas* and its progeny, the supreme court has clearly stated that restricting *economic* damages awarded to victims of medical malpractice for the general goal of attempting to reduce overall costs to the healthcare industry violates the Open Courts Provision of the Texas Constitution. *See Horizon/CMS*, 34 S.W.3d at 902; *Rose*, 801 S.W.2d at 842; *Lucas*, 757 S.W.2d at 692; *see also* TEX. CONST. art III, § 66 (permitting *restriction of noneconomic damages* in common-law medical malpractice actions). In doing so, the supreme court emphasized that the legislature had not provided a plaintiff who suffered injuries in excess of the damages cap "any adequate substitute to obtain redress for his injuries." *Lucas*, 757 S.W.2d at 690. According to the supreme court, "It is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are the most severely injured and therefore most in need of compensation." *Lucas*, 757 S.W.2d at 692 (quoting *Carson*, 424 A.2d at 837). Today, there is still no adequate substitute for a plaintiff who has suffered economic injuries in excess of a legislative restriction. *See id*.

Further, we note that chapter 33 is titled "Proportionate Responsibility" and provides "a proportionate responsibility framework for apportioning percentages of responsibility in the calculation of damages." *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 499 (Tex. 2010); *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001-.017. Chapter 33 requires the trier of fact to determine "the percentage of responsibility, stated in whole numbers, for" "each claimant," "each defendant," "each settling person," and "each responsible third party who has been designated." TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a). It reduces the damages awarded by the trier of fact "by a percentage equal to the claimant's percentage of responsibility." *Id*. §§ 33.001, 33.012(a). Further, it provides for settlement credits to be applied to a claimant's recovery in a

health care liability claim. *See id*. § 33.012(c). Thus, "chapter 33 embodies the fundamental tort-law principle that liability generally arises only from one's own injury-causing conduct and, as a result, liability for damages is commensurate with fault." *In re Xerox*, 555 S.W.3d at 523. "Chapter 33's proportionate responsibility scheme also incorporates the one-satisfaction rule—a tort concept that limits a plaintiff to only one recovery for any damages suffered because of an injury." *Id*. (emphasis added). "The one-satisfaction rule's purpose is to make the plaintiff whole, but not more than whole, for [her] injuries." *Home Ins. Co. v. McClain*, No. 05-97-01479-CV, 2000 WL 144115, at * 7 (Tex. App.—Dallas 2000, no pet.). This purpose of making the plaintiff whole, but not more than whole, is not consistent with restricting a plaintiff from recovering less than the full amount of her economic damages. Thus, we conclude that application of a settlement credit under chapter 33 that has the effect of preventing Puente from recovering the full amount of her economic damages violates the Open Courts Provision of the Texas Constitution.

Here, all the damages awarded by the jury to Puente are economic damages.[31] Thus, applying chapter 33's settlement credit provisions and reducing Puente's award in an amount equal to C.P.'s settlement results in Puente recovering less than the full amount of her economic damages. The supreme court has clearly held the legislature may not restrict the recovery of the full amount of economic damages in a common-law medical malpractice action like the one brought by Puente in this case. *See Horizon/CMS*, 34 S.W.3d at 902; *Weiner*, 900 S.W.2d at 317; *Rose*, 801 S.W.2d at 842; *Lucas*, 757 S.W.2d at 690. We recognize that *Lucas* and its progeny involved statutes that "capped" damages while chapter 33 relates to the application of settlement credits to a jury's award; however, whether the statute involves a damages cap or whether it

---

[31] The jury found that Puente was entitled to the following: (1) $133,202 in loss of earning capacity sustained in the past; (2) $888,429 in loss of earning capacity that in reasonable probability Puente will sustain in the future; and (3) $13,263,874.86 in medical care expenses that in reasonable probability Puente will incur in the future.

involves a settlement credit, the result is the same as applied to the facts of this case—application of the statute would prevent a plaintiff in a common-law medical malpractice action from recovering the full amount of her economic damages. *Compare* TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.011(1), 33.012(c), *with Horizon/CMS*, 34 S.W.3d at 902; *Weiner*, 900 S.W.2d at 317; *Rose*, 801 S.W.2d at 842; *Lucas*, 757 S.W.2d at 690. Under either scenario, the statute impermissibly restricts a cognizable common law action by preventing a plaintiff in a common-law medical malpractice action from recovering the full amount of her economic damages.[32]

We note that Dr. Virlar and Gonzaba argue that Puente and her daughter C.P. are one "claimant" under chapter 33 and thus have not received less than the full amount of their economic damages. However, the legislature cannot circumvent the Open Courts Provision by simply statutorily changing the definition of "claimant" and thereby *restricting a common law cause of action protected by the Open Courts Provision*. As noted previously, the Texas Supreme Court has held that a medical malpractice cause of action like Puente's is a cognizable common law cause of action that "Texas courts have long recognized." *Lucas*, 757 S.W.2d at 688. And, in such a

---

[32] As noted previously, the supreme court in *Lucas* answered the certified question posed by the Fifth Circuit by explaining why the Texas statute capping damages impermissibly restricted the common-law medical malpractice cause of action. 757 S.W.2d at 691-92. We recognize that in the background section of its opinion, the supreme court mentioned that the federal district court had applied a settlement credit to the amount awarded to the plaintiffs. *See id.* at 688. However, the supreme court did not analyze whether application of this settlement credit would violate the Open Courts Provision as no such question was posed to it. *See id.* at 688-92. We note that in considering the facts presented in *Lucas* under current caselaw interpreting the Open Courts Provision, application of the settlement credit in *Lucas* would not have resulted in the child recovering less than the full amount of his economic damages. The child's parents in *Lucas*, 811 F.2d at 271, brought a lawsuit in their individual capacities and as next friend of their son. *Id.* After a trial, the federal district court awarded the parents economic damages for medical expenses they had incurred and would incur until their son reached eighteen years of age. *Id.* However, with respect to their individual claims, the district court "made no findings concerning the parents' claims for their own mental anguish and loss of companionship." *Id.* The district court also awarded the son the following economic damages: "$350,000 as the present value of future medical expenses he will incur after his eighteenth birthday, and $600,000 as the present value of the impairment of his future earning capacity." *Id.* As for noneconomic damages, the district court awarded the son "$1.5 million for pain and suffering." *Id.* The district court then "reduced the total award of damages against the United States by the $400,000 paid by Wyeth Laboratories to the Lucases in settlement of the state court suit." *Id.* Because the son was awarded $1.5 million in noneconomic damages, an amount that far exceeded the amount of the $400,000 settlement credit, he necessarily received the full amount of his economic damages even after application of the settlement credit. Thus, reducing his award by the amount of the settlement credit did not violate his rights under the Open Courts Provision.

common-law cause of action, the legislature may not statutorily restrict a plaintiff's right to recover the full amount of her economic damages. *See Horizon/CMS*, 34 S.W.3d at 902; *Rose*, 801 S.W.2d at 842; *Lucas*, 757 S.W.2d at 692; *see also* TEX. CONST. art III, § 66 (permitting restriction of noneconomic damages in common-law medical malpractice actions). The supreme court also recognized that under the common law, a child's claim for loss of consortium, like the one brought by C.P. in this case, is a "*separate and independent claim[] distinct from the underlying action*." *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 646 (Tex. 2009) (emphasis added). The supreme court has also rejected the argument that allowing a party to recover damages for loss of consortium while also allowing the injured party to recover damages would result in a "double recovery." *See Whittlesey v. Miller*, 572 S.W.2d 665, 669 (Tex. 1978). According to the supreme court, "there is no duplication of recovery" and no violation of the one-satisfaction rule. *Id*. For example, in the context of (1) an injured spouse and (2) a spouse seeking recovery for loss of consortium, the supreme court has explained that "[e]ach spouse recovers for losses *peculiar to the injury sustained by each of them*." *Id*. (emphasis added). "On the one hand, the impaired spouse recovers for those distinct damages arising out of the direct physical injuries." *Id*. "On the other hand, the recovery for the loss of consortium by the deprived spouse is predicated on separate and equally distinct damages to the emotional interests involved." *Id*.

Applying this reasoning by the supreme court to the facts presented here, under the common law, any damages suffered by C.P. for loss of consortium are her own; such damages would not constitute a double recovery and would not violate the one-satisfaction rule. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d at 646; *Whittlesey*, 572 S.W.2d at 669. Because any damages suffered by C.P. for loss of consortium are her own, any credit applied pursuant to chapter 33 against Puente's award in an amount equal to C.P.'s damages would necessarily result in Puente failing to recover the full amount of her economic damages. Thus, application of chapter 33's

settlement credit provision under the facts of this case is an impermissible statutory restriction of Puente's right to recover 100% of her economic damages under her common-law claim.

Finally, we note that Dr. Virlar and Gonzaba argue on appeal that Puente failed to meet her burden in the trial court of raising an open courts challenge, arguing that "Puente provided no analysis of how applying a settlement credit for C.P.'s settlement to Puente's recovery violates the state and federal Constitutions." Dr. Virlar and Gonzaba, however, cite no authority that an open courts challenge must be "analyzed" in response to a post-verdict motion for settlement credits. It appears that no court has addressed the burden of a party asserting an open courts challenge in the context of responding to a post-verdict motion for settlement credits under chapter 33. In other contexts, courts have held that the party relying on the open courts provision has the burden to plead and prove the violation. *See Boyd v. Kallam*, 152 S.W.3d 670, 676 (Tex. App.—Fort Worth 2004, pet. denied). Here, by focusing on Puente's lack of "analysis," Dr. Virlar and Gonzaba do not argue that she failed to meet any evidentiary burden. Indeed, the facts on which Puente relied for her open courts challenge are undisputed, obviating any need to present evidence to prove the relevant facts. We therefore must determine whether Puente adequately pled an open courts challenge in her response to Dr. Virlar and Gonzaba's post-verdict motion for settlement credits.

Dr. Virlar and Gonzaba have not provided any authority as to the appropriate pleading standard for an open courts challenge. Generally, the purpose of a pleading is to "give fair notice of the nature and basic issues so the opposing party can prepare a defense." *Bos v. Smith*, 556 S.W.3d 293, 305-06 (Tex. 2018). There is no apparent reason why a heightened pleading standard should apply to open courts challenges. "When, as here, no special exception is made, we liberally construe the pleadings in the pleader's favor." *Id*. at 306. "Even so, a liberal construction does not require a court to read into a petition what is plainly not there." *Id*. (citation omitted). Here, Puente

stated in her response to Dr. Virlar and Gonzaba's post-verdict motion for settlement credits the following:

> In the alternative, Plaintiff would show that any attempt to reduce one person's claim or cause of action by the amount received by another person on a separate and independent cause of action violates not only relevant statutes and common law, but also Plaintiff's rights under the Texas and U.S. Constitutions, including their respective due process, due course of law, equal protection, equal rights, jury trial, and open courts provisions.

Although there is no lengthy legal argument in Puente's response, an open courts challenge is plainly there. *See Bos*, 556 S.W.3d at 306. Her response refers to the Open Courts Provision and provides the factual basis upon which her constitutional challenge is based. Her constitutional challenge stated the nature of the basic issue she was raising. Thus, we conclude Dr. Virlar and Gonzaba had fair notice of her open courts challenge as a bar to application of the settlement credit as argued by Dr. Virlar and Gonzaba in their post-verdict motion for settlement credits.

### 5. *Remand for Hearing Pursuant to* **Utts**

While we have concluded that applying a dollar-for-dollar credit in the amount of C.P.'s settlement against Puente's award pursuant to chapter 33 would violate the Open Courts Provision of the Texas Constitution, we note that at the trial court and on appeal, Dr. Virlar and Gonzaba have argued that C.P.'s settlement was a "sham settlement," pointing to testimony by the guardian ad litem from the prove-up hearing for C.P.'s settlement. In *Utts v. Short*, 81 S.W.3d 822, 824 (Tex. 2002), the supreme court considered whether a pretrial settlement by a family member in a medical malpractice action should be applied to amounts awarded by the jury to the nonsettling family members. The supreme court explained that a defendant seeking a settlement credit has the burden of proving his right to such a credit. *Id*. at 828. According to the court, "the common law requires only that the record show, in the settlement agreement or otherwise, the settlement credit amount." *Id*. (citing *First Title Co. v. Garrett*, 860 S.W.2d 74, 78-79 (Tex. 1993), which explained

that under the common law, a defendant is entitled to seek a settlement credit under the one-satisfaction rule). "Once the nonsettling defendant demonstrates a right to a settlement credit, the burden shifts to the plaintiff to show that certain amounts should not be credited because of the settlement agreement's allocation." *Utts*, 81 S.W.3d at 828.

In *Utts*, the defendant contended the pretrial settlement by one family member was a "sham" transaction to avoid application of chapter 33's settlement-credit scheme to the other nonsettling family members. *Utts*, 81 S.W.3d at 829. In discussing the burden a defendant has to raise the issue of a "sham" settlement, the supreme court noted that "when a case involves facts suggesting that a nonsettling plaintiff may have benefited from the proceeds of another plaintiff's settlement, the nonsettling defendant must raise this allegation to the trial court–not the jury–and present evidence of the benefit as part of its burden in electing for a dollar-for-dollar credit." *Id*. The court noted that a defendant did not have to present evidence before the case was presented to the jury but could "urge its settlement-credit motion and introduce evidence" in a post-verdict motion. *Id*. "If the evidence shows such a benefit, then the trial court should apply the settlement credit reflecting that benefit unless the nonsettling plaintiff presents evidence that he or she did not benefit from the settlement." *Id*. "In other words, once the nonsettling defendant presents evidence of the nonsettling plaintiff's benefit from a settlement, the trial court shall presume the settlement credit applies unless the nonsettling plaintiff presents evidence to overcome this presumption." *Id*.

In applying this law to the facts presented in *Utts*, the supreme court explained that the nonsettling defendant had placed the amount of the settlement with the settling family member (who was no longer a party at the time of trial) in the record. *Id.* at 830. The nonsettling defendant further offered evidence that the nonsettling family members (who were plaintiffs at the time of trial) benefitted from the settling family member's settlement. *Id*. The supreme court concluded the record evidence raised a presumption that the nonsettling defendant may be entitled to a

settlement credit but that the record did not establish the amount. *Id.* The supreme court thus remanded the cause to the trial court to allow each family member an opportunity to present evidence to show that he or she did not receive any benefit from the settling family member's settlement. *See id.* (explaining that to avoid the settlement credit, each nonsettling family member on remand must "present evidence showing why the settlement credit should not apply").

Similarly, here, Dr. Virlar and Gonzaba argued in their post-verdict motion that Puente benefited from C.P.'s settlement with the hospital. As evidence, they submitted the reporter's record from the prove-up hearing for C.P.'s settlement and pointed to testimony from C.P.'s guardian ad litem. They also stressed that after C.P. settled with the hospital, Puente and her mother (Carr) dismissed all their claims against the hospital with prejudice. We conclude Dr. Virlar and Gonzaba presented evidence raising a presumption that they may be entitled to a settlement credit under the common law. *See Utts*, 81 S.W.3d at 829; *First Title Co.*, 860 S.W.2d at 79 (application of settlement credit under common law's one-satisfaction rule). In response to the motion, Puente filed an affidavit by her counsel disputing that Puente received a benefit from C.P.'s settlement with the hospital. The trial court then denied Dr. Virlar and Gonzaba's motion for settlement credit but did not have an opportunity to make an evidentiary finding as to any benefit Puente received from C.P.'s settlement. Thus, as in *Utts*, we remand the case to the trial court so that it may conduct an evidentiary hearing.

We note that in her second motion for rehearing, Puente again argues, as she did in *Virlar II*, that her second remittitur in the amount of $434,000.00 would cure any reversible error committed by the trial court with respect to Issue 4 (the settlement credit issue). *See Virlar II*, 2020 WL 2139313, at *1. We again reject her second remittitur of $434,000.00. As we explained in *Virlar II*, Texas Rule of Appellate Procedure 46.5 provides that if a court of appeals reversed a "trial court's judgment because of a legal error that affects only part of the damages awarded by

the judgment, the affected party may . . . voluntarily remit the amount that the affected party believes will cure the reversible error." TEX. R. APP. P. 46.5. If "the court of appeals determines that the voluntary remittitur cures the reversible error, then the court must accept the remittitur and reform and affirm the trial court judgment in accordance with the remittitur." *Id*. "If the court of appeals determines that the voluntary remittitur is not sufficient to cure the reversible error, *but that remittitur is appropriate*, the court must suggest a remittitur in accordance with Rule 46.3." *Id*. (emphasis added). As explained above, the trial court in this case denied Dr. Virlar and Gonzaba's motion for settlement credit but did not have an opportunity to make an evidentiary finding as to any benefit Puente received from C.P.'s settlement. Thus, we do not believe that remittitur is appropriate on the settlement credit issue. Nor can we conclude, based on the record before us, whether $434,000.00 would cure the error. We therefore reject Puente's second remittitur in the amount of $434,000.00. *See* TEX. R. APP. P. 46.5; *M & A Tech., Inc. v. iValue Grp., Inc.*, 295 S.W.3d 356, 372 (Tex. App.—El Paso 2009, pet. denied) (op. on reh'g) (rejecting voluntary remittitur because remittitur inappropriate under appellate record presented).

### PERIODIC PAYMENTS

In their final issue, Dr. Virlar and Gonzaba argue the trial court erred in failing to award future damages payable in periodic payments. Chapter 74 of the Texas Civil Practice and Remedies Code permits periodic payments when the award of future damages exceeds a present value of $100,000.00. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.502.[33] Section 74.503 provides,

(a)   At the request of a defendant physician or health care provider or claimant, the court *shall* order that medical, health care, or custodial services awarded in a health care liability claim be paid in whole or in part in periodic payments rather than by a lump-sum payment.

---

[33] Section 74.502 provides that "[t]his subchapter applies only to an action on a health care liability claim against a physician or heath care provider in which the present value of the award of future damages, as determined by the court, equals or exceeds $100,000." TEX. CIV. PRAC. & REM. CODE ANN. § 74.502.

(b)    At the request of a defendant physician or health care provider or claimant, the court *may* order that future damages other than medical, health care, or custodial services awarded in a health care liability claim be paid in whole or in part in periodic payments rather than by a lump sum payment.

(c)    The court *shall* make a specific finding of the dollar amount of periodic payments that will compensate the claimant for the future damages.

(d)    The court *shall* specify in its judgment ordering the payment of future damages by periodic payments the:
(1) recipient of the payments;
(2) dollar amount of the payments;
(3) interval between payments; and
(4) number of payments or the period of time over which payments must be made.

*Id*. § 74.503 (emphasis added). Thus, section 74.503 has both discretionary and mandatory language.

With regard to future damages other than medical, health care, or custodial services, the trial court has discretion to order periodic payments. *See id.* § 74.503(b) (stating the trial court "may" order periodic payments). However, with regard to future medical, health care, or custodial services awarded, upon the request "by a defendant physician or health care provider, a trial court *must* order that medical, health care, or custodial services awarded" "be paid *in whole or in part in periodic payments*." *Gunn v. McCoy*, 554 S.W.3d 645, 679 (Tex. 2018) (discussing subsection (a)) (emphasis added). "When periodic payments are ordered, the court must make specific findings as to the amount of periodic payments, and the court's judgment must specify the amount, the timing of payments, and the number of payments or time period over which payments are to be made." *Id.* (discussing subsections (c) and (d)).

In a post-trial motion, Dr. Virlar and Gonzaba filed a Motion for Order on Periodic Payments, requesting that the full amount of Puente's award for future medical expenses in the

amount of $13,263,874.86 and future loss of earning capacity in the amount of $888,429.00 (minus any applicable settlement credits) be payable in periodic payments instead of a lump sum payment. According to Dr. Virlar and Gonzaba, because Dr. Altman testified Puente's reasonable life expectancy was thirty-one years, the trial court should divide the amount of the awards for future damages by thirty-one.[34] After a hearing, the trial court denied the motion for periodic payments.

To the extent our determination of this issue involves statutory construction, statutory construction is a "legal question we review de novo." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). "In construing statutes, we ascertain and give effect to the Legislature's intent as expressed by the language of the statute." *Id.*

### A. Waiver?

According to Puente, Dr. Virlar and Gonzaba waived any right they had to periodic payments under section 74.503 because they "never pleaded this matter of defense and avoidance," and "did not object to the court submitting the damages question to the jury in the usual form of 'what sum if paid now in cash.'" Instead, they filed a post-trial motion. Section 74.503, however, makes no mention of when a defendant must make the request for periodic payments. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.503. And, we agree with Dr. Virlar and Gonzaba that requesting periodic payments is not a matter "in avoidance" or an affirmative defense. *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156 (Tex. 2015); *MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136 (Tex. 2014). That is, section 74.503 is not a bar to recovery but merely a method of how recovery will be paid.

---

[34] Below and on appeal, Puente argued that such a calculation would constitute a "double discount." That is, the jury awarded, as instructed by the court, the value of future damages reduced to the present value of money. This was the first discount. Puente contends that Dr. Virlar and Gonzaba's formula of dividing this present value award for future damages by Puente's life expectancy of thirty-one years would constitute yet another discount of the value of money —hence, a "double discount." At oral argument, defense counsel acknowledged that such a formulation would be a discount of the jury's award.

Further, section 74.503 provides that the trial court, not a jury, shall make the specific finding of the *dollar* amount of periodic payments that will compensate the claimant for the future damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.503(c). It further requires the trial court, not the jury, to specify the interval between the payments, and "the number of payments or the period of time over which payments must be made." *Id.* § 74.503(d). Finally, section 74.503 does not become applicable until a jury awards future damages, and the court determines that the present value of that award equals or exceeds $100,000.00. *See id.* § 74.502 ("This subchapter applies only to an action on a health care liability claim against a physician or health care provider in which the present value of the award of future damages, *as determined by the court*, equals or exceeds $100,000") (emphasis added). Given that the trial court, and not the jury, is making the appropriate findings, there is no reason why it cannot do so at a post-trial hearing.[35] We therefore find no waiver by Dr. Virlar and Gonzaba in filing their request for periodic payments post-trial but before judgment was signed by the trial court.

### B. Evidence of Financial Responsibility

Pursuant to section 74.505, before the trial court may authorize periodic payments of future damages, it must require "a defendant who is not adequately insured *to provide evidence* of financial responsibility in an amount adequate to assure full payment of damages awarded by the

---

[35] We note that Puente also argues that if section 74.503 allows for a request for periodic payments to be made post-trial, then her rights to due process and due course of law under the Texas Constitution, along with the separation of powers doctrine, would be violated. Puente's argument is based on the assumption that no additional evidence can be brought to the trial court at the hearing on the motion for periodic payments. Puente argues that the trial court will have to engage in "speculation" to make the appropriate findings. However, given that chapter 74 presents a post-trial proceeding and the trial court is required to make fact findings, we find nothing in chapter 74 that would prevent the trial court from hearing additional evidence on matters like discount rates and the plaintiff's near and future financial expenses. Thus, we do not believe Puente has shown any constitutional violation. *See Walker v. Gutierrez*, 111 S.W.3d 56, 66 (Tex. 2003) (explaining that courts presume a statute is constitutional and the "party challenging the constitutionality of a statute bears the burden of demonstrating that the enactment fails to meet constitutional requirements").

judgment." TEX. CIV. PRAC. & REM. CODE ANN. § 74.505(a) (emphasis added). The judgment must then provide for payments to be funded by

(1) an annuity contract issued by a company licensed to do business as an insurance company, including an assignment within the meaning of Section 130, Internal Revenue Code of 1986, as amended;
(2) an obligation of the United States;
(3) applicable and collectible liability insurance from one or more qualified insurers; or
(4) any other satisfactory form of funding approved by the court.

*Id*. § 74.505(b).

Puente argues that the trial court did not err in not ordering periodic payments because Dr. Virlar and Gonzaba never showed evidence of financial responsibility under section 74.505(a). Subsection (a) requires *a* defendant *to provide* evidence of financial responsibility in an amount adequate to assure full payment of damages awarded. *Id.* § 74.505(a). As noted, when construing a term in a statute, we ascertain and give effect to the Legislature's intent as expressed by the language used in the statute. *City of Rockwall*, 246 S.W.3d at 625. When the statute does not define a particular term, we construe the term according to its "plain and common meaning," "unless a contrary intention is apparent from the context" or "unless such a construction leads to absurd results." *Id*. Chapter 74 does not define "provide"; thus, we look to its plain and common meaning. *See id*.; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(b) ("Any legal term or word of art used in this chapter, not otherwise defined in this chapter, shall have such meaning as is consistent with the common law."). The plain meaning of "provide" is "to supply" or "to furnish." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1827 (1981).

At the post-trial hearings on Dr. Virlar and Gonzaba's motion for periodic payments, they provided evidence of Gonzaba's financial responsibility in the form of a balance sheet and

testimony from Melissa Keller, Gonzaba's controller.[36] In reviewing the balance sheet and testimony, we hold Gonzaba provided evidence of financial responsibility in an amount adequate to assure full payment of damages awarded. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.505(a).

Even if Gonzaba provided evidence of financial responsibility, Puente emphasizes that Dr. Virlar did not. According to Puente, both Dr. Virlar and Gonzaba are required to provide evidence of financial responsibility under subsection (a). Subsection (a), by its plain language, requires "a defendant . . . to provide evidence of financial responsibility." *Id.* We disagree with Puente.

When, as here, both defendants are jointly and severally liable for the full amount of the judgment, the practical ramifications of Puente's interpretation would frustrate the intent of the Legislature. "A party who is jointly and severally liable for the judgment is liable not only for its own share of the judgment but also, as between itself and the plaintiff, for the shares of the judgment attributable to other defendants." 5 Tex. Prac. Guide: Personal Injury 2d § 16:49 (2019). "If one or more defendants are insolvent, the jointly and severally liable defendant can be made to pay the portion of the judgment attributable to those defendants." *Id.* "Further, the plaintiff can collect the entire amount of a joint and several judgment against any defendant jointly and severally responsible, and leave it to that defendant to collect contribution for any overpayments from the other defendants." *Id.* Assuming the facts of this case—that is, assuming Gonzaba provided evidence of financial responsibility but its employee, Dr. Virlar, did not—under Puente's interpretation of subsection (a), Gonzaba could be granted its requested relief of making periodic payments but, in practicality, be denied that relief because Puente could seek to collect the entire amount of the joint and several judgment from Gonzaba when Dr. Virlar did not pay the lump sum

---

[36] Puente argues in her brief that she objected to Keller's testimony "because [Keller] had never been designated as an expert witness or even a person with knowledge of relevant facts." Puente's argument refers to pretrial discovery. As we have previously explained, Dr. Virlar and Gonzaba properly moved for periodic payments in a post-trial proceeding.

in full. We conclude the Legislature could not have intended such a result. Therefore, under the facts of this case, we hold that only one jointly and severally liable defendant was required to provide evidence of financial responsibility under subsection (a).

### C. Subsection (b)'s Periodic Payments at Discretion of Court

Dr. Virlar and Gonzaba first argue that the trial court erred in failing to order periodic payments in accordance with section 74.503(b). Subsection (b) allows the trial court at its discretion to order "future damages other than medical, health care, or custodial services awarded in a health care liability claim" to "be paid in whole or in part in periodic payments rather than by a lump sum payment." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.503(b) (providing that at the request of the defendant, the court "may" order "future damages other than medical, health care, or custodial services awarded in a health care liability claim be paid in whole or in part in periodic payments rather than by a lump sum payment").

Here, Puente was awarded $888,429.00 in damages for loss of future earning capacity.[37] Unlike future medical expenses, a trial court's decision whether to order periodic payments to compensate for future loss of earning capacity is completely discretionary. *See id*. Dr. Virlar and Gonzaba's briefing in this appeal focuses on subsection (a)'s mandatory language and the fact that the trial court failed to order *any* amount to be paid in periodic payments. Dr. Virlar and Gonzaba, however, in their briefs do not adequately argue why the trial court erred under subsection (b). *See* TEX. R. APP. P. 38.1(i). Given that the trial court "may" order periodic payments under subsection (b), Dr. Virlar and Gonzaba were required to bring forth an argument explaining why the trial court abused this discretion. *See id*. We therefore hold they waived any error relating to subsection (b).

---

[37] As noted previously, we have determined there is legally and factually sufficient evidence of $880,429.00 and have thus suggested a remittitur decreasing the award for loss of future earning capacity by $8,000.00.

Further, in reviewing the record, we find no abuse of discretion by the trial court in failing to award periodic payments for future loss of earning capacity.

### D.        Subsection (a)'s Periodic Payments Mandatory

Unlike subsection (b), subsection (a) requires a trial court, at the request of a defendant health care provider, defendant physician, or claimant, to order "medical, health care, or custodial services awarded in a health care liability claim [to] be paid in whole or in part in periodic payments rather than by a lump-sum payment." TEX. CIV. PRAC. & REM. CODE ANN. § 74.503(a) (providing that trial court "shall" order periodic payments in whole or in part). "When a trial court orders periodic payments, it 'shall make a specific finding of the dollar amount of periodic payments that will compensate the claimant for the future damages' and shall specify the amount, number, timing, and recipient of those payments in its judgment." *Regent Care of San Antonio, L.P. v. Detrick*, No. 19-0117, 2020 WL 2311943, at *5 (Tex. May 8, 2020) (quoting TEX. CIV. PRAC. & REM. CODE § 74.503(c)-(d)).

"The party requesting an order for periodic payments has the burden to identify for the trial court evidence regarding each of the findings required by section 74.503, and the findings must be supported by sufficient evidence." *Id*. "The trial court record may not contain all of the evidence necessary to make the required findings, and the trial court has discretion to receive additional evidence for that purpose." *Id*. "Such evidence may not be used to contradict the jury's findings on any issues submitted to it, however." *Id*. "Subchapter K gives the trial court no discretion to craft its own award of damages inconsistent with the jury's verdict." *Id*.

In *Regent Care*, the nursing facility argued the trial court abused its discretion by ordering that $256,358 in future medical damages be paid periodically because that figure was not supported by the evidence and did not conform to the verdict. *Id*. at *4. The jury had "found that $3 million, 'if paid now in cash,' would compensate [the plaintiff] for his future medical expenses." *Id*. After

trial, the nursing facility requested that the trial court order "payment of the jury's entire award periodically over five to eight years." *Id*. The trial court ordered the nursing facility to pay $256,358 periodically in twenty-four monthly installments. *Id*. In reviewing the trial court's decision, the supreme court agreed with the nursing facility "that the specific amount the trial court ordered to be paid periodically—$256,358—[was] not supported by sufficient evidence." *Id*. at *5. The supreme court explained that while there was sufficient evidence to support an award of $3 million in damages for future medical care, "no evidence indicated that only $256,358 of these medical expenses would be incurred periodically." *Id*. at *5-*6.

However, even though no evidence supported the trial court's finding regarding periodic payments, the supreme court explained that the nursing facility was not entitled to reversal:

> Nevertheless, Regent Care is not entitled to reversal unless this error harmed it— that is, unless the trial court had discretion to order that a larger amount of Detrick's damages be paid periodically. We conclude such an order would be an abuse of discretion on this record because Regent Care did not point the court to any evidence supporting its request that the entire $3 million award be paid periodically, nor to evidence of *any* specific dollar amount of medical expenses that would be incurred periodically. At trial, the parties presented their evidence regarding damages *solely in present values without detailing how those damages were discounted*, and the jury found the amount that would fairly and reasonably compensate Detrick for future medical care expenses "if paid now in cash." No party requested that the jury find the amount that would compensate Detrick if paid periodically—unsurprisingly, as Subchapter K had not yet been invoked. Nor did Regent Care offer evidence post-trial from which the trial court could make such a finding. We agree with Detrick that simply ordering the jury's present-value damages award to be paid in periodic installments—whether in whole or in part— would be an abuse of discretion here because it would effectively "double discount" the award, undercompensating him for the expenses he would incur in each future period. *See* TEX. CIV. PRAC. & REM. CODE § 74.503(c) (requiring trial court to find dollar amount of periodic payments that will "compensate the claimant for the future damages.").

*Regent Care*, 2020 WL 2311943, at * 6 (emphasis added). According to the supreme court, "[b]ecause no other order was possible given the evidence before" the trial court, "the trial court did not abuse its discretion by declining to order that more of the damages Regent Care owed Detrick to be paid periodically." *Id*.

Like in *Regent Care*, the parties in this case presented their evidence regarding damages solely in present value terms, without detailing how those damages were discounted. *See id*. Like the jury in *Regent Care*, the jury in this case was asked what sum of money, "if paid now in cash," would fairly and reasonably compensate Puente for future medical care expenses. *See id*. The jury answered $13,263,874.86. As in *Regent Care*, no party requested the jury to determine the amount of money that would compensate Puente if paid periodically. *See id*. Like the nursing facility in *Regent Care*, Dr. Virlar and Gonzaba did not offer any evidence post-trial from which the trial court could make such a finding. *See id*. The only argument made by Dr. Virlar and Gonzaba post-trial was that the trial court should divide the jury's award of future medical expenses into thirty-one equal annual payments because there was evidence that Puente was expected to live another thirty-one years. As the supreme court explained in *Regent Care*, "simply ordering the jury's present-value damages award to be paid in periodic installments—whether in whole or in part— would be an abuse of discretion" because "it would effectively 'double discount' the award, undercompensating" the plaintiff for expenses she would incur in each future period. *Id*.

Dr. Virlar and Gonzaba admit there was no evidence presented from which the trial court could have made a finding on periodic payments of future medical expenses, but argue that "issues existed impacting the award of future damages in this case that should have been, but were not, decided by the trial court before any determination or presentation of evidence, if necessary, regarding the specific amounts of periodic payments [they]

sought." According to Dr. Virlar and Gonzaba, those issues included (1) "the amount of the settlement credit to which [they] were entitled based on the hospital's settlement, and its impact on the award of future damages"; and (2) whether Dr. Virlar and Gonzaba had met their burden to present evidence of financial responsibility pursuant to section 74.505(a).[38] Dr. Virlar and Gonzaba argue that because the trial court denied their motions without giving findings of fact or conclusions of law, they "had no way to know that specific amount of future damages awarded would be subject to periodic payments."

However, as pointed out by Puente, Dr. Virlar and Gonzaba "had a full and fair opportunity to provide the trial court with evidence to support an order of periodic payments *after the trial court informed them it had denied their request for any credit* for Puente's daughter's settlement with the hospital." (emphasis in original). We agree with Puente that the record reflects "Virlar and Gonzaba knew at the time that the trial court heard their periodic payment evidence that the [trial] court had already disallowed any credit beyond the $200,000 credit for the settlement with Dr. Patel." Thus, after the trial court's ruling on the settlement credits, Virlar and Gonzaba had an opportunity to present evidence in support of their request for periodic payments of future medical expenses.

The supreme court in *Regent Care* recognized that in ordering periodic payments, a trial court may receive additional evidence to make the required findings under Subchapter K, but "[s]uch evidence may not be used to contradict the jury's findings on any issues submitted to it." *Regent Care*, 2020 WL 2311943, at *5. The supreme court stressed that "Subchapter K gives the trial court no discretion to craft its own award of damages *inconsistent with the jury's verdict*." *Id*. (emphasis added). As noted, there was

---

[38] As explained previously in this opinion, we have held that they did.

no evidence introduced post-verdict that would support an amount of periodic payments of future medical expenses. The evidence at trial supporting future medical expenses was presented in present-value terms. Puente's expert, Dr. Fairchild, presented evidence totaling almost $3 million more than the jury awarded. Further, his opinion with respect to future medical expenses consisted of different discount rates depending on the specific expense because Dr. Fairchild assumed different inflation rates for each. Thus, with this record, it was impossible for the trial court to order periodic payments that was *consistent with the jury's award*. As in *Regent Care*, "[b]ecause no other order was possible given the evidence before" the trial court, we hold the trial court did not err in declining to order periodic payments of future medical expenses. *Id*. at *6.

## CONCLUSION

We hold the trial court did not err in excluding the expert testimony of Dr. Kuncl or in admitting evidence of Dr. Virlar's loss of privileges and alleged extraneous bad acts. We further hold the evidence was legally and factually sufficient to support the jury's award of loss of future earning capacity in the amount of $880,429.00, but not in the full amount awarded ($888,429.00). We accept the remittitur filed by Puente in the amount of $8,000.00 and modify the judgment to reflect that Puente recover damages against Dr. Virlar and Gonzaba for loss of future earning capacity in the amount of $880,429.00. *See* TEX. R. APP. P. 46.3, 46.5. We do not disturb any other damages awarded by the jury. Additionally, we find no reversible error by the trial court in failing to award periodic payments for future loss of earning capacity under section 74.503(b) or for future medical care expenses under section 74.503(a). Finally, with respect to any applicable settlement credit from C.P.'s settlement with the hospital pursuant to the common law's one-satisfaction rule, we conclude a benefits analysis should be conducted pursuant to *Utts v.*

*Short*, 81 S.W.3d 822 (Tex. 2002). Therefore, we reverse the judgment in part and remand the cause for the trial court (1) to conduct an evidentiary hearing on any benefit received by Puente from C.P.'s settlement with the hospital pursuant to *Utts* and apply an appropriate settlement credit, if any, and (2) to sign a new judgment in conformity with this opinion.

Liza A. Rodriguez, Justice